### THE WABASH RAILROAD COMPANY v. KELLEY.

[No. 17,694. Filed Dec. 16, 1898. Rehearing denied Oct. 3, 1899.]

RAILROADS.—*Master and Servant.*—*Malpractice of Hospital Surgeon.*—Where a railroad company deducted a portion of an employe's wages for the maintenance of a hospital to provide surgical and medical service for its employes in case of accident it cannot escape liability for damages to such employe arising by reason of the malpractice of its hospital surgeon, on the ground that the deduction of the employe's wages was made without his written consent contrary to the provisions of §§2300, 2301 Burns 1894. *pp. 121-125.*

EVIDENCE.—*Railroads.*— *Malpractice.*— *Incompetency of Surgeon.*— *Notice.*—In the trial of an action by an employe against a railroad company for damages arising from the malpractice of the defendant's hospital surgeon, evidence as to the reputation of such sur-

geon for sobriety was admissible for the purpose of showing that the officers of the company had notice of his incompetency. *pp. 127, 128.*

RAILROADS.—*Malpractice of Hospital Surgeon.*—A railroad company is liable to an employe for damages resulting from an operation performed by an incompetent surgeon employed in a hospital maintained by such company by money deducted from the wages of its employes, and managed by a board of trustees made up of the general officers of the road. *pp. 128, 132.*

EVIDENCE.—*Railroads. — Principal and Agent.*—In the trial of an action brought by an employe against a railroad company for damages resulting from the malpractice of its hospital surgeon, a statement made by one who engaged plaintiff to work for defendant, and kept his time, to the effect that the rules of the company required a deduction to be made from his wages each month for the maintenance of the hospital, was admissible as the declaration of defendant. *pp. 124, 132.*

SAME. — *Railroads.—Hospital Surgeon.—Incompetency.—Notice.*—In the trial of an action against a railroad company for damages resulting from an operation performed upon plaintiff by defendant's hospital surgeon, the testimony of another patient of improper treatment by such surgeon during the same time plaintiff was treated was admissible on.the question of notice to defendant of the incompetency of the surgeon. *p. 133.*

From the DeKalb Circuit Court. *Affirmed.*

*J. E. Rose, J. H. Rose* and *Stuart Bros. & Hammond,* for appellant.

*R. W. McBride, C. S. Denny, F. S. Roby, T. S. Wickwire, J. S. Shuman* and *D. M. Link,* for appellee.

HOWARD, J.—Appellee was a fireman on one of appellant's freight engines. On August 2, 1893, while his train was running from Del Ray, Mich., to Ashley, Ind., and while he was engaged in his duties cleaning his engine, he slipped and fell from an alleged defective step on the engine, and the wheels ran over and crushed one of his feet. It is alleged in the complaint filed by appellee that the company "had undertaken, at the time it employed plaintiff, and as a part of the contract of his employment, and did on said day undertake, to provide surgical and medical attendance and care to the plaintiff, as the same should be rendered necessary

by casualty and accident, and to treat him for such injuries received while in its service." Accordingly, immediately after his said injury, appellant took appellee to the Emergency Hospital, in Detroit, where his foot was amputated by a Dr. Maire, a local surgeon acting for appellant's medical division. Afterwards, on August 5, 1893, appellee was removed by appellant to Peru, in this State, and placed in the hospital located there, and connected with appellant's railroad. This hospital was then in charge of one Dr. Higgins, as local surgeon, under Dr. Morehouse, chief surgeon of the hospital department of the Wabash Railroad Company. On August 9, 1893, Dr. Higgins reamputated three or four inches more of appellee's leg. On November 2, 1893, Dr. Morehouse removed Dr. Higgins on account of his indulgence in the use of drugs; and, in December following, an additional amputation was performed on appellee's leg by a Dr. Griswold, appointed by Dr. Morehouse to succeed Dr. Higgins. About an inch and a quarter more of the bone of the leg was removed in this third amputation.

In appellee's complaint damages were sought both for the negligence of appellant in the use of the defective engine step and other acts alleged to have caused the accident, and also by reason of malpractice on the part of Dr. Higgins in the second amputation, and other treatment of the wounded leg. The jury found for appellant as to the original accident and for appellee as to malpractice by Dr. Higgins, and assessed damages in the sum of $6,500.

The sufficiency of the complaint is questioned under various assignments of error. The defect indicated is that it appears from the complaint that the company exacted from appellee, without his written consent given, a part of his wages to be used for the maintenance of a hospital, contrary to the provisions of §§2300, 2301 Burns 1894 (Acts 1885, p. 123). Appellant has retained appellee's money and has placed the same in its treasury as a part of its funds for the care of its sick and disabled employes; but contends that, as appellee

did not give his written consent to such retention, he has, therefore, by reason of appellant's said wrongdoing, no right to the benefit which appellant promised him in return for the money so exacted. We do not think the complaint shows any agreement on the part of appellee to violate the statute in question. It is alleged, simply, that the appellant had undertaken, as a part of the contract of employment, to provide surgical and medical attendance and care to the appellee, as the same should be rendered necessary by casualty and accident, and to treat him for such injuries received while in its service; that, consequently, on the happening of appellee's injury, appellant was in duty bound to furnish him such medical and surgical services; and that appellant, recognizing its said duty, did send appellee first to the Emergency Hospital at Detroit, and then to the hospital at Peru, to receive the care and attention originally promised. Such undertaking to provide surgical and medical care is not, by the statute, made void as a part of the contract of service. The provision of the statute is that it shall be unlawful for a railroad company "to exact from its employes, without first obtaining written consent thereto in each and every instance, any portion of their wages for the maintenance of any hospital, reading-room, library, gymnasium or restaurant." If the appellant did, indeed, exact any such contributions without the written consent of appellee,—which does not appear from the complaint,—that was not a wrong for which appellee can be held liable. It was the act of appellant; and it is a familiar principle that one cannot take advantage of his own wrong.

As to the deductions from appellee's wages, it appears from the complaint that appellee had no voice in the matter, but that appellant had "for seven years [the period of appellee's service] deducted and taken from his monthly wages the sum of fifty cents per month, with which to reimburse and recompense itself for expenses and charges incurred or rendered necessary in treating or providing surgical and medical

Wabash R. Co. v. Kelley.

treatment for plaintiff." It would be strange, indeed, if appellant, while retaining this money, could now claim that appellee had no right to the promised benefit from the money so retained, for the reason only that appellant had no right so to retain it. Even if such unlawful retaining by appellant could, in any way, be considered as a contract on the part of appellee, still, as said in 9 Am. & Eng. Ency. of Law, 910, "an innocent party, defrauded by a guilty one, may have redress as to him." The law is aimed at the wrongdoer. So it was said, in *Stockwell* v. *State*, 101 Ind. 1: "The general rule is, that contracts in violation of law are void, but this rule will not be extended and applied to a case like this, so as to enable the wrongdoer to take advantage of his own wrong against an innocent party." And, in *Phoenix Ins. Co.* v. *Pennsylvania R. Co.*, 134 Ind. 215, 20 L. R. A. 405, Judge Coffey writing the opinion, it was held that a foreign insurance company, which had insured property for an agreed consideration, could not, in case of loss, avoid payment on the ground that it had wrongfully omitted to comply with the statute regulating foreign insurance companies. "The law ceases with the reason thereof," as said in *Deming* v. *State*, 23 Ind. 416. In that case many instances are given and authorities cited, showing that it is a grave error to regard the rule here relied upon "as a merely arbitrary rule, applicable to all contracts which are prohibited by statute." It is the wrongdoer himself, the violator of the statute, who is prohibited from reaping any benefit from his own wrong. In *Winchester Electric Light Co.* v. *Veal*, 145 Ind. 506, cited by counsel, the party who sought to recover under the violated statute was himself a principal wrongdoer in the violation of the statute. It is not shown here, either in the complaint or by the evidence, that the appellee was guilty of any violation of the statute in suffering a part of his wages to be retained by the appellant.

The first reason given to show that the court erred in overruling the motion for a new trial is substantially the same as

that urged against the sufficiency of the complaint; that is, that, under the statute above cited, appellant had no right, without appellee's written consent, to make deductions from his wages in order to reimburse itself for care given or to be given to him in case of sickness or accident. We think we have shown this reasoning to be unsound. Appellant may not thus visit its own wrong upon the head of appellee.

Appellee's evidence showed that he worked for the company seven years; that he was hired by one Sternberg, who employed and discharged men, and directed them in their work; that, when the first pay-car came along, Sternberg explained the matter of deducting monthly amounts from his wages, saying: "The company's surgeons and physicians would treat me and all my nursing would be done, and that they had trained nurses, and that they could take care of the men better at the hospital than any man could be taken care of at home. I told him I never had been sick any, and I would rather not pay the hospital fee, and run my own chances, and take care of myself. He said, if I worked for the company I would have to pay it. If I didn't want to pay it, I would have to quit working for the company. * * * I didn't make any kick about it after that, and it was always taken out of my wages."

To the same effect was the company's book of rules, which was introduced in evidence. This book is entitled as follows: "Book of Rules. Form 1399. The Wabash Railroad Company. Hospital Department." At the end it is authenticated as follows: "Approved, Charles M. Hayes, General Manager, Dr. H. W. Morehouse, Chief Surgeon." In this book of rules, the names of the several surgeons and hospitals are given; among them Dr. L. E. Maire, local surgeon, at Detroit, and Dr. C. B. Higgins, assistant chief surgeon, at the Peru hospital. The first rule set out in the book of rules is as follows: "(1) In order to provide a fund for the support of a hospital and the care of the sick and injured employes a deduction will be made on the pay rolls from the pay of each

employe as follows: Where the pay of an employe amounts to $50 or more per month a deduction of 50 cents will be made; where the pay of an employe amounts to less than $50 per month a deduction of 35 cents will be made. The above deductions will be made in all cases where the employe is in continuous service, or has worked as many as fifteen days in such month."

We do not think anything further is needed to show that appellant had assumed an obligation to care for its injured employe, and that it cannot now thrust that obligation aside under the plea that it had no right, under the statute, to take from the employe, without his written consent, a part of his wages, monthly, during his seven years' service. If the company should feel that by reason of the violated statute it could not conscientiously carry out its promise to care for the appellee, then it ought at least, in compliance with the dictates of the same good conscience, return, with interest, the money which it had so persistently retained from his wages.

Counsel for appellant next insist that the evidence fails to show that Dr. Higgins was incompetent to perform the duties of a surgeon at the time of the alleged malpractice. The incompentency of Dr. Higgins, as claimed by appellee, was not due to any original want of knowledge or skill as a surgeon, but to violence of temper, roughness of conduct, and carelessness, chiefly due, as alleged, to habits of drunkenness, induced by the use of whisky and drugs. A great deal of testimony was given on both sides of this and other disputed matters on the trial. On which side was the greater weight of evidence in any case is not for us to determine. Counsel for appellant details a large amount of evidence by most respectable witnesses to show that Dr. Higgins was considered by these witnesses to be an able and trustworthy physician and surgeon. Counsel for appellee have quite as formidable an array who gave evidence to support the conclusion of the jury that he was not such reliable and trust-

worthy physician and surgeon, at least from the date when appellee was admitted to the hospital until Dr. Higgins was discharged, three months afterwards, on account of the excessive use of drugs.

It is true that much of the evidence which tends to support the verdict was given by those whom counsel call "a set of malignants, brim full and running over with animosity against appellant on account of their discharge." We have, however, been unable to discover in their evidence any malignity or animosity. The witnesses were not impeached. It would be easy to accuse appellant's witnesses of some tendency to favor their employer. But we do not think counsel on either side have anything to gain by unduly characterizing the testimony of those who are sworn to tell the truth, and who, so far as the record shows, seem to have striven to perform that solemn duty. In any case, this matter of judging witnesses and weighing their testimony, was a duty to be performed by the jury, in rendering their verdict, and by the court in passing on the motion for a new trial. All that is left for us to do is to see whether there was or was not competent and sufficient evidence given upon which the verdict of the jury may rest. Not only was there competent evidence given by appellee's witnesses from which the jury might infer that Dr. Higgins was at the time in question intoxicated and incompetent, but much corroborative evidence to the same effect came also from appellant's witnesses. Even Dr. Morehouse, appellant's surgeon in chief, testified that on November 2, 1893, when he went to Peru to discharge Dr. Higgins for using cocaine to excess, the doctor told him that he had contracted the habit of using that drug two or three years previous, at a time when he had been up night and day during the sickness and death of a beloved daughter. Dr. J. Spooner, consulting surgeon of the Peru hospital, testified that Dr. Higgins, in the next month, after his removal by Dr. Morehouse, went to an inebriate asylum or sanitarium at LaPorte; and that he died some time later, after his return;

from LaPorte. Dr. Spooner also admitted that after the return from LaPorte Dr. Higgins told him that many a time he had taken a quart of whisky with him at night to drink up before morning, or words to that effect; though Dr. Higgins did not tell him when it was that he had drunk whisky to this amount. Dr. H. O. Wells, house surgeon at the Peru hospital, who does not seem to have considered the amputation performed by Dr. Higgins to have been necessary, testified to conduct on the part of Dr. Higgins which may well have caused the jury not only to believe him to have been under the influence of intoxicants or narcotics, but also to have been rough and uncouth in his language and conduct towards his patient, the appellee.. No matter how great the talent and ability of Dr. Higgins as a surgeon may have been, there can be no doubt that there was evidence given from which the jury might infer that at the time of the amputation by him, and afterwards while he cared for appellee's wounded leg, up to the date of his removal by Dr. Morehouse, he was unfit for the responsible work with which he was intrusted as surgeon in charge of the hospital.

What we have said as to the evidence of the surgeon's drunkenness and consequent incompetency, may also be applied to the evidence adduced for and against the question of malpractice. Competent evidence was adduced on each side, and that which sustains the verdict of the jury was sufficient for the purpose. Whether the second amputation was necessary, whether it was performed in a proper manner, and whether the patient received proper care thereafter until the third amputation became necessary to correct the evil results of the second, were all questions for the jury; and they have decided these questions in favor of the appellee.

Evidence was also introduced as to the reputation of Dr. Higgins for sobriety during the year 1893, in order to show that Dr. Morehouse and other officials of the company knew of his incompetency; and the court specially instructed the jury that this evidence as to reputation was admitted only

for the purpose of bringing home to appellant knowledge of such incompetency and unfitness. Dr. Morehouse himself testified that he made it a rule to visit each hospital once a month, or oftener. He recollected visiting the hospital at Peru three times during September, 1893. Several of the officials also lived at Peru. The jury may therefore have believed from the evidence that the reputation of Dr. Higgins as to sobriety was known, or should have been known, to Dr. Morehouse and other officials of the company long before the time of his removal, November 2, 1893. Dr. Morehouse, besides, admitted that complaint had been made to him previous to June, 1893, by one of the patients of the hospital, accompanied by a physician, urging certain charges as to conduct of Dr. Higgins affecting his conduct as surgeon. The jury may have thought this alone sufficient to put the chief surgeon on inquiry, during his monthly visits, and thus enable him to learn whether the talk as to Dr. Higgins' misconduct was well founded or not. It was the duty of those in charge to use ordinary care in seeing that only competent surgeons were kept in control of the hospitals of the company.

Counsel finally contend that, even if malpractice on the part of Dr. Higgins and failure on the part of Dr. Morehouse to remove him after learning of his inefficiency are shown by the evidence, yet appellant is not liable, for the reason that it is shown that the hospital system is managed by a board of trustees, consisting of "the vice-president, the general manager, and the assistant secretary of the Wabash Railroad Company," all general officers of the road, and members of the executive department; and also because the funds for the support of such hospital system are made up of deductions from the wages of the employes of the company, which funds, it is said, are confided to the management of said trustees. We think that, even from what has already appeared from the record, a much closer relation is shown between the company and its hospital system than counsel

would have us understand.  From the moment the employe begins work until his treatment in the hospital on account of sickness or accident, the hospital department, as we think, is shown to be as closely connected with the administration and management of the road as any other department of the company's business.  Everything is superintended and directed by the company, the hospital officers acting and reporting precisely as officers of other divisions of the company's affairs.

The publication issued by the company and entitled "Book of Rules.  Form 1399.  The Wabash Railroad Company.  Hospital Department.  List of local surgeons and instruction issued for information of employes," is quite as much a part of the machinery of government used by the company as any other document put forth by its authority. Rule one of this book, as we have seen, provides for deductions from the employe's wages as the source of income to support the company hospitals, and to care for sick and injured employes.  Rule two fixes and prescribes the rights of the sick or injured employe to care and treatment while disabled. Rule three provides for blank certificates of admission, to be placed in the hands of foremen, and by them issued to such of their men as may be entitled thereto.  Rule three provides for free transportation to the nearest hospital of employes holding such certificates.  Rule four provides that in case of necessity the surgeon of the nearest hospital may arrange by telegraph for such transportation without a certificate. Rule five provides for the free use of the company's telegraph line.  Special rule one requires immediate report to the "chief officers of the road and the surgeon in charge of the nearest hospital" in every case of injury to an employe.  Special rule two provides that, in case an injured employe cannot be moved, he shall be placed in care of "the nearest local agent," and that "the nearest available local surgeon" shall be summoned; except that in case there be absolute necessity, and then "for the first attention only," the nearest competent sur-

geon shall be secured until "the local surgeon can reach the spot." By special rule three provision is made for stretchers to be kept at the stations and in the baggage cars. Special rule four requires a report by wire to the hospital surgeon to be sent by "the conductor in charge of the train having patients." In case of injury by wreck to a number of passengers or employes, special rule five provides for the summoning of the local surgeons and also other competent surgeons, and, besides, for notification "by wire at once to the nearest hospital and the chief officers of the road." In case of injury to citizens, trespassers, and others not employes or passengers, those in charge are required by special rule six to give notice to the local authorities, and also to "notify by wire the general claim agent at St. Louis." Such injured persons are not to be sent "to company's hospitals," and no employe is to incur expenses in such cases, "except for surgeon for first attention only, without special authority from the general claim agent." Special rule seven provides that, in case of death of passenger, employe or others, notice is to be given to "the chief officers of the road" and others named, but no expenses are to be incurred "until first specially authorized by the chief surgeon or general claim agent."

It further appears from the evidence, that the money exacted from the employes goes into the company's treasury, and that it is paid out again in quite the same way as in case of any other department of the Wabash Railroad Company. The accounts of the hospital department are kept and the bills audited by the general auditor of the road, and the bills are paid by the general treasurer. The hospital department has no treasury or fiscal officer of its own, as separate or apart from the general treasury and auditing departments of the Wabash Railroad Company. Indeed so far as any independence of control of the Wabash Company goes, the medical department cannot be distinguished from any of the other great departments of

that system. There is no written contract or agreement of any kind between the hospital department of the company and the company itself. All is directed by the general management. Outside of the rules prescribed by the company, there is no authority for any action of the department or the employes. The title to the ground upon which the Peru hospital is located is held by the vice-president, general manager, and assistant secretary of the company, as trustees of the hospital fund, subject, however, to the order and direction of the board of directors of the Wabash Railroad Company.

The evidence, all considered, shows clearly that the property of the medical department, quite the same as the property of any other department of the road, is wholly under the control and management of the company; and that although the funds for its support are drawn from the wages of the employes, they are but nominally in the hands of the trustees named, and are so held by them merely for the convenience and advantage of the company. So far as the trustees act in relation to such property, they act as officials of the company. The company undertook to care for its disabled employes out of moneys derived from their own monthly wages, and the plan devised for the hospital department has been contrived as the means of carrying out that undertaking. Whatever defects may be found in the plan adopted, or in the manner in which it has been conducted, it appears, on the whole, to be a wise and praiseworthy undertaking. It would, however, be a great wrong to hold that the obligation to comply with the duty so assumed by the company could be lightly thrust aside by laying it upon the shoulders of the officials who, under direction of the company, are placed in charge of the several hospitals and relief system established by the company itself. Here, as in *Pittsburgh, etc., R. Co.* v. *Sullivan,* 141 Ind. 83, the appellant company, having undertaken to provide its injured and sick employes with medical and surgical assistance, was bound to exercise reason-

able diligence in the selection and retention of its physicians and other attendants. This reasonable diligence included, of course, the duty to supervise the work of its hospitals, and to discharge any appointees who, although reasonably competent at the time of their appointment, had, on account of the use of intoxicants and narcotics, or for other causes, since become incompetent. This was particularly the case where the incompetency of the hospital surgeon had become notorious in the community, so that the appellant's supervising officials must have, or at least ought to have, known it.

The criticism of counsel in regard to instructions given and refused and those modified by the court, has all, as we think, been sufficiently considered in what we have said of the contract relation of appellant and appellee, and of the hospital system as a department of the appellant company. Having found no available error in the record, the judgment is affirmed.

### ON PETITION FOR REHEARING.

BAKER, J.—An extended examination of the record confirms the conclusion that the judgment is right. Nothing needs to be added to the matters covered by the opinion. Appellant contends, however, that there is reversible error in assignments not passed upon.

The testimony concerning the conversation with Sternberg, mentioned in the opinion, is objected to. In view of evidence that Sternberg engaged appellee to work for appellant and kept his time, the declaration was made when and regarding a matter in which Sternberg stood for appellant. *Pennsylvania Co. v. Nations,* 111 Ind. 203.

Parks was called for appellee to prove that the reputation of Dr. Higgins for sobriety was bad in Peru and along the line of appellant's road among the employes. This was competent only for the purpose of bringing home to appellant notice of Higgins's unfitness to remain in charge of the hospital. On cross-examination appellant sought to show that

Wabash R. Co. v. Kelley.

the witness's knowledge of the subject-matter was limited to one branch of appellant's road. On reëxamination witness stated that he had talked with two men on the main-line. Then followed: "You say Higgins was talked about? Yes, sir. You may state whether or not the conversation between you and the two men related to securing the removal of Dr. Higgins from the hospital? Yes, sir, it did." As appellant had refrained from asking for conversations, it would not have been permissible for appellee to bring them out. But no conversation was detailed. The reëxamination was directed merely to showing that the subject-matter of the conversation was supportive of the direct examination. In conversations of this nature it is not the person's "general reputation" that is talked of, but rather his fitness, his habits, his characteristics, from which flows his general reputation. To have failed to elicit that the subject of the conversation with the main-line men related to matter that might affect Higgins's reputation would have left the reëxamination irrelevant.

Whitman testified to Higgins's treatment of his broken arm on September 25, 1893, at the hospital. Appellee was under Higgins's care from August 5th to October 9th. A third amputation of appellee's leg, in December, 1893, was charged in the complaint to be due to Higgins's neglect down to and including October 9th. There being evidence in support of the charge, the testimony of Whitman was admissible on the question of notice to appellant of Higgins's incompentency.

Appellant complains of the form of numerous interrogatories on the ground that facts are assumed therein. Fifty or more were submitted by each party. In both sets questions are asked on the basis of facts previously embraced. This method seems to be practically unavoidable; and the court, far from abusing its discretion in controlling the interrogatories to be submitted, appears to have been

careful that all questions of fact should be fairly presented.

The rulings on giving, refusing and modifying instructions, so far as the particular case was concerned, accord with the principles laid down in the opinion. Appellant insists, however, that the court erred in refusing its fifty-fifth request: "If upon any material fact in the complaint the weight of evidence is with the defendant or equally balanced between plaintiff and defendant, then in such case such fact is not proved by the preponderance of evidence and the finding of the jury as to such fact should be for the defendant." If, as counsel assert, this request was not covered by any instruction given to the jury, the omission would be fatal. But an examination of the record discloses that the court in its fifth instruction gave the very charge requested by appellant.

Appellee lost his foot by his own fault. But we cannot say, under the evidence, that for the suffering and injury consequent upon the second and third amputations the jury awarded excessive damages. Petition overruled.