# CHARLESTON.

## GUY *v.* LANARK FUEL COMPANY.

Submitted June 7, 1912.    Decided September 30, 1913.

1. MASTER AND SERVANT—*Liability to Servant—Medical Attendance —Negligence.*

   A master who employs a physician to treat his employes and collects small monthly fees from their wages, all of which he turns over to the physician as his compensation, is not liable for the physician's malpractice, unless he was negligent in selecting or retaining him. (p. 731).

2. SAME.

   Having selected a competent physician, the master may rely upon the presumption that his competency will continue, until notice of a change. (p. 732).

3.  Same—*Liability to Servant—Medical Attendance.*

> Evidence of the physician's general reputation for drunkenness, in the community in which he practices, is admissible as tending to prove that the master knew, or by proper diligence should have known, of it.  (p. 733).

4.  Same.

> To constitute constructive notice the reputation must be so general and notorious that ignorance of it shows neglect of the master's duty.  Reputation confined to a small number of the master's employes is not sufficient.  (p. 734).

5.  Same—*Liability to Servant—Medical Attendance—Notice of Incompetency.*

> Where the reasons, which are relied upon to charge the master with knowledge of the physician's reputation, apply with equal force to show knowledge by the servant also, the negligence of the latter in not complaining is as great as that of the former in retaining the physician.  (p. 735).

Error to Circuit Court, Raleigh County.

Action by Annie L. Guy against the Lanark Fuel Company. Verdict for plaintiff, and, from an order granting a new trial, plaintiff brings error.

*Affirmed.*

*Sanders & Crockelt,* and *M. F. Matheny,* for plaintiff in error.

*Price, Smith, Spilman & Clay,* and *McGinnis & Hatcher,* for defendant in error.

Williams, Judge:

Plaintiff recovered a verdict for $12,500 damages against defendant in an action of trespass on the case for a personal injury, alleged to have been caused by the malpractice of Dr. A. B. Nelson, who was employed by defendant company to treat its employees and their families.  The court sustained defendant's motion to set aside the verdict, and granted it a new trial, and plaintiff was awarded this writ of error to that order of the court.  Her counsel urge that it was error to set aside the verdict.

Defendant is engaged in mining coal, and employs a large number of miners.  It employed Dr. Nelson to treat, profes-

sonally, its employes and members of their families. In consideration of the physician's services each married employee was required to pay a monthly fee of $1.00, and each unmarried one a fee of 75c. The fees were deducted from the wages earned, and the money turned over to the doctor. The company retained no part of it, nor is there any evidence that it profited by the physician's services. Plaintiff, the wife of Benjamin M. Guy, who is one of defendant's employees, became ill on October 15, 1910, and Dr. Nelson was summoned in. She was then suffering great pain. Both she and her husband testify that they told the doctor that she had not menstruated for two or three months and had then begun to menstruate, and Mrs. Guy says she told him that such a thing had never occurred in her life before; that she had always been strong and healthy and regular in her periodical sickness and that she feared she was going to have an abortion. The doctor did nothing but take her temperature and give her a few white tablets, and told her she would be all right in the morning. This visit was made between seven and nine o'clock in the evening. He returned the next day about twelve o'clock, and did nothing but repeat the performance of the previous evening. He came to see her the third day. Plaintiff says she was then very much worse, and told him that she feared she was going to die. He made no examination of her person, and pronounced her temperature normal. She and her husband both testify that on the third visit the doctor was drunk. The next day her husband called in Doctor Hume, who made a digital examination and discovered that she was suffering from an abortion. Dr. Hume says he found that there was some infection, necessitating an operation. He gave her some medicine to relieve her pain, and on the next day returned and curetted the uterus and found portions of an afterbirth; he also discovered that septic poison had set in, caused, he says, by the retention of portions of the afterbirth. He testifies that curetting is the usual practice, in such case, and gives it as his opinion that, if this had been done sooner, it was strongly probable that infection and septisemia would not have followed. He also says that it was the duty of a physician, having the history of the case, to make a digital examination. Dr. Hume treated her for about a week, but she

continued to grow worse on account of the infection, which extended from the uterus up into the fallopian tubes and involved the ovaries to such an extent that she had to be taken to a hospital and have them removed. Her physical suffering and mental anguish were very great. She remained in the hospital over five weeks. She was then 37 years old, had been married 15 years, and was the mother of five children.

Counsel for defendant practically admit that the evidence is sufficient to warrant the jury in concluding that plaintiff's injury resulted from the neglect or malpractice of Dr. Nelson, due to his drunken condition, but they insist that the evidence fails to prove negligence on the part of defendant, that the jury were not justified in finding against it and that the court properly set aside the verdict.

To entitle plaintiff to recover it is necessary to prove two things: (1) that the malpractice of Dr. Nelson was the proximate cause of her injury; and (2) that defendant was negligent in selecting or in retaining him. Defendant was under no legal obligation to provide a physician and surgeon for its employees; but, having assumed to do so, it was bound to exercise reasonable care to select a competent and skillful one. *Neil* v. *Flynn Lumber Co.*, 71 W. Va. 308, 77 S. E. 324; *Big Stone Gap Iron Co.* v. *Kenton*, 102 Va. 23; *Secord* v. *St. Paul &c. Ry. Co.*, 18 Fed. 221; *Laubheim* v. *DeK. N. S. Co.*, 107 N. Y. 228; and *Dye* v. *Corbin*, 59 W. Va. 266 It was not bound to select a physician possessing the highest degree of competency and skill, but only the average skill of physicians in the locality in which he was to practice. *Lawson* v. *Conaway*, 37 W. Va. 159, and *Neil* v. *Flynn Lumber Co.*, supra.

"Where the hospital is maintained by a master for the sole purpose of relieving injured servants, without any intention of profit to himself, he is not liable to his servants for the malpractice of the physician employed if ordinary care was exercised in selecting him, although the hospital is supported by the contributions of the servants." 26 Cyc. 1082; 5 Labatt (2d ed.), section 2005; *Richardson* v. *Carbon Hill Coal Co.*, 10 Wash. 648, 39 Pac. 95; and *Quinn* v. *Kansas City &c. Co.*, 94 Tenn. 713, 28 L. R. A. 552. To the same effect as above is *Neil* v. *Flynn Lumber Co.*, supra.

Did defendant exercise reasonable care in the selection and retention of Dr. Nelson? If it did, then it is not liable for his malpractice; otherwise it is liable. The record discloses no proof whatever that Dr. Nelson was not, at the time of his employment, generally competent. On the contrary, it is proven that he had graduated at a reputable medical college, had successfully passed an examination by the state medical board of this state, had had some experience in actual practice, and was recommended for employment to defendant's superintendent by another reputable physician. But the contention is, that after his employment, he became so much addicted to the excessive use of intoxicants as to render himself careless and incompetent, and that he had acquired so general and notorious a reputation for drunkenness in the community, that defendant either must have had actual knowledge of it, or was negligent in not obtaining such knowledge.

No more rigid rule is applicable in case of the employment of a physician to treat its servants than is applicable in the case of employment of fellow servants, and it is well settled in such cases that the master's duty is not wholly discharged by the exercise of proper care in their selection in the first instance. He is bound to keep himself advised as to their continued fitness, so far as it can be accomplished by proper supervision and superintendence. 3 Labatt (2d ed.), section 1098; *Cooney* v. *Commonwealth &c. R. R. Co.,* 196 Mass. 11, 81 N. E. 905; *B. & O. R. R. Co.* v. *Henthorne,* 73 Fed. 634, 17 C. C. A. 623; *The Ohio & Miss. Ry. Co.* v. *Collarn,* 73 Ind. 261, 38 Am. Rep. 134; *N. & W. R. R. Co.* v. *Nuckols,* 91 Va. 193. But the same degree of care to keep himself informed of the continued fitness of his servants is not required of the master as in case of their employment, or as is required in keeping machinery and appliances, which are known to deteriorate with use, in proper repair. On the contrary, "When suitable and competent persons have been employed, good character and proper qualifications may be presumed to continue, and the master may rely on that presumption until notice of a change." 3 Labatt (2d ed.), section 1098. *Southern P. Co.* v. *Hetzer,* 1 L. R. A. (N. S.) 288, 135 Fed. 272; *Blake* v. *Maine &c. R. R. Co.,* 70 Me. 60, 35 Amer. Rep. 297; *The Lake Shore &c. Ry. Co.* v. *Stupak,* 123

Ind. 210, 23 N. E. 246; *Mich. Cent. R. R.* v. *Gilbert*, 46 Mich. 176.

A corporation acts by, and obtains knowledge through, its officers and agents, and knowledge acquired by them is generally attributed to it. But there is no evidence that any of defendant's officers had actual knowledge of Dr. Nelson's drunken habits. On the contrary, it is proven by Mr. L. E. Yoder, defendant's chief engineer and superintendent, who employed the doctor, and by Mr. John Porter, his successor in office, who was in charge of the mine at the time plaintiff's injury occurred, that they had not heard of Dr. Nelson's drinking and knew nothing of it, prior to 15th October, 1910, the time of plaintiff's sickness, notwithstanding they say they made inquiry frequently, when at Lanark, to find out if there were any complaints against him. Moreover, Mr. Porter says plaintiff's husband was the first one who thereafter informed him of his drinking. This testimony is not contradicted and it proves that defendant did not have actual knowledge of the doctor's incompetency. But it seems to be well settled that the general reputation of an employee for drunkenness or habitual carelessness, in the community in which he is employed, is admissible as tending to prove that the master had actual knowledge thereof and that he should have been thereby put upon inquiry to ascertain if that reputation was well founded. *B. & O. R. R. Co.* v. *Henthorne,* 73 Fed. 634; *Wabash R. R. Co.* v. *Kelley,* 153 Ind. 119, 52 N. E. 152; *Driscoll* v. *City of Fall River,* 163 Mass. 105; *Gilman* v. *Eastern R. R. Co.,* 13 Allen (Mass.) 433; *Davis* v. *Railway Co.,* 20 Mich. 105; *Western Stone Co.* v. *Whalen,* 151 Ill. 472; *Hills* v. *Chicago &c. Ry.,* 55 Mich. 437; 1 Wigmore on Evidence, section 249. In *Wabash R. R. Co.* v. *Kelley, supra,* it was held that: "The reasonable diligence which a railroad company must use in carrying out its agreement to care for its injured and sick employes includes the duty to discharge a surgeon in chief who had become incompetent from the use of intoxicants and narcotics, which was notorious in the community, so that the supervising officials of the company must have, or at least ought to have known it." Judge Cooley, in *Davis* v. *Detroit &c. R. R. Co.,* 20 Mich. at page 124, says: "The ignorance itself is negligence in a case in which any proper inquiry

would have obtained the necessary information, and when the duty to inquire was plainly imperative." But can we say that it was the duty of defendant to make inquiry of persons in the neighborhood to ascertain if Dr. Nelson had continued to remain a sober man, before it had received any intimation that he was drinking? Such a course would be unusual indeed, and we do not think the rules of law lay upon defendant any such requirement. For, having ascertained that the doctor was competent at the time it employed him, defendant had a right to presume he would continue so. It was reasonable to suppose that his professional skill would improve with practice; and the law does not recognize such general depravity in mankind as to exact of an employer ceaseless vigilance to guard against its consequences.

Does the testimony prove that the doctor's reputation for drunkenness, in the community in which he was practicing, was so general as to establish negligence in defendant not to know of it? We think not. Certainly not, when its officers and managers in charge of its works at Lanark, where the doctor lived and practiced, testify that they never heard of his drinking. Nearly all the witnesses examined on this question were, or had been, employes of defendant and lived at, or near its mine. Five or six of plaintiffs witnesses testified to having seen the doctor in a state of intoxication, sometimes two or more of them being witnesses to the same occasion. This testimony was admissible for the purpose of proving the doctor's incompetency, as there is also evidence tending to prove that he failed to give plaintiff proper treatment at the time he was called to see her because of his then drunken condition. But it was not admissible for the purpose of proving his general reputation. 1 Wigmore on Evidence, section 250.

On the other hand quite as many witnesses, including Ben Guy, plaintiff's husband, testified for defendant that they never heard his reputation for drunkenness or sobriety discussed prior to October 15, 1910. In *Driscoll* v. *Fall River,* 163 Mass. 105, the court, in discussing the effect of evidence as to the general reputation of one of its employes as affecting the master with notice of his careless habits, says: "The reputation of a foreman amongst a few workmen employed under him is not a general

reputation. It is merely the opinion of a small number of men, of which there is no sufficient reason to suppose the master may be cognizant, or which he may be bound to heed." See also the opinion of Judge Cooley, of same purport, in *Davis* v. *Detroit &c. R. R. Co.,* 20 Mich. at page 123; 3 Labatt on Master and Servant (2nd ed.) section 1105; and *Walkowiski* v. *Penokee &c. Mines,* 115 Mich. 629, 73 N. W. 895.

R. E. Peters, D. W. Anderson, Ben Carey, Henry Thomas, and Spencer Thompson testified that they were acquainted with the doctor's reputation in the community, and that he had the reputation of being a drunkard. But on cross-examination none of them could give the names of more than one or two persons whom they had heard speak of the matter; and generally, when a name was mentioned it proved to be some one of the other witnesses. Moreover, most of the witnesses were unable to say whether they had heard it mentioned before, or after, the time of plaintiff's injury. Such testimony is too uncertain and indefinite to support a verdict depending on proof of general reputation as matter of notice. It shows that the reputation is limited and not general. It does not arise to the dignity of proof of a general reputation. Nor does it prove that the limited reputation for drunkenness was not acquired after October 15, 1910, the time of plaintiff's injury. Shortly after that time, the doctor was taken to a sanitarium, and it is admitted that he then acquired a very general reputation for drunkenness. But defendant was not affected by a reputation thereafter acquired.

But there is another reason why we think the court did not err in setting aside the verdict, and that is this, the evidence by which plaintiff seeks to show defendant's negligence applies with equal force to prove her own negligence, or that of her husband, which is the same thing, for he acted as her agent in calling in the physician. Ben Guy's opportunities to know Dr. Nelson's general reputation for drunkenness, if he had such reputation, was equally as good as, if not better than, that of defendant's managers. He lived in the same community with the doctor, they did not; he saw him frequently and had, on previous occasions, called him in to treat members of his family. In *Davis* v. *Detroit &c. R. R. Co., supra,* which was an action

by defendant's "head yardman" to recover damages for an injury received through the carelessness of one of its engineers. Plaintiff and the engineer were fellow-servants; and the principle on which he sought to make defendant liable was its negligence in retaining a careless and incompetent fellow-servant. The only evidence in that case to show that defendant knew or should have known of the engineer's careless habits was the testimony of a few witnesses as to his reputation in that regard. Judge Cooley, in discussing the effect of such evidence upon plaintiff at page 125, says: "It cannot be claimed that the officers of the company were chargeable with constructive notice of the unfitness of Harris, and the plaintiff not. The same facts which it is claimed they ought to have heard about, must have transpired in his immediate presence, or at least within the limited space within which he was constantlly employed, and in view of those with whom he was constantly associated. All the reasons which charge the officers with knowledge apply with more force to a person situated as he was, in a position intermediate the persons who would be likely to complain and the officers. The probability that he was fully informed is greater than that they were, and if they were guilty of negligence in not discharging Harris, we think the plaintiff was guilty of at least equal negligence in not complaining of him."

We do not mean to say that the duty rests upon the servant, as it does upon the master, to acquaint himself in regard to the competency of a fellow-servant with whom he is working, but what we do say is, that, having knowledge of such incompetency, it is the servant's duty to bring it to the attention of his master, else he will be held to have assumed the risk. And in the present case the only evidence of knowledge is the testimony of certain witnesses as to reputation, and it is just as reasonable to suppose that Ben Guy had notice of it as that defendant had. Like a two-edged sword, the evidence cuts both ways. See also 4 Thompson on Negligence, sections 4895-4896.

For the reasons herein given we affirm the judgment of the lower court and remand the case for further proceedings.

*Affirmed.*