PER CURIAM. A rehearing is granted herein but restricted to the question of title apart from and outside of the pleas of prescription discussed and disposed of in the opinion heretofore handed down, the judgment remaining undisturbed in so far as the maintaining or overruling of these pleas is concerned, but being set aside in so far as it passes finally upon the question of title; and the case is remanded for further trial.

----

(63 South. 257.)

No. 19,480.

NATIONS v. LUDINGTON, WELLS & VAN SCHAICK LUMBER CO.

(June 30, 1913. Rehearing Denied Oct. 20, 1913.)

*(Syllabus by Editorial Staff.)*

1. MASTER AND SERVANT (§ 238*)—INJURIES TO SERVANT—CONTRIBUTORY NEGLIGENCE.

Where a sawmill employé, whose duty it was to shift lumber from one set of rolls to another, took hold of a piece of timber with his hand instead of using the pick furnished him, he was guilty of contributory negligence, barring recovery against his employer for injury to his hand, by being crushed by the piece of lumber immediately following.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 681, 743–748; Dec. Dig. § 238.*]

2. DEATH (§ 76*) — CAUSE — SUFFICIENCY OF EVIDENCE.

Evidence, in an action for the death of plaintiff's husband, *held* to show that the death was caused by chloroform administered by a physician secured by the defendant employer.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 94; Dec. Dig. § 76.*]

3. MASTER AND SERVANT (§ 92*)—WHAT CONSTITUTES—ADMINISTRATION OF CHLOROFORM.

Permitting a layman to administer chloroform to plaintiff's decedent preparatory to an operation upon his injured hand was negligence, where an immediate operation was unnecessary, and an assistant physician to administer the chloroform could easily have been procured in a short time.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 143; Dec. Dig. § 92.*]

4. MASTER AND SERVANT (§ 92*)—DUTY OF MASTER—HOSPITAL SERVICES—NEGLIGENCE.

Where the defendant employer engaged an incompetent physician, who negligently permitted chloroform to be administered to plaintiff's decedent by a layman, causing his death, the employer was liable for failure to provide a second physician to administer the chloroform, though the operating physician was paid out of a fund provided by employés, administered by the employer, but from which it derived no profit.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 143; Dec. Dig. § 92.*]

5. MASTER AND SERVANT (§ 265*) — NEGLIGENCE OF MASTER—EMPLOYMENT OF PHYSICIAN—BURDEN OF PROOF.

Where, in an action for the death of plaintiff's decedent from chloroform administered by a layman under direction of a physician engaged by the defendant employer, it appeared that such physician was not registered in the state, the burden was on defendant to overcome the prima facie case of his incompetency, made out by the result of his work.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 877–908, 955; Dec. Dig. § 265.*]

6. DEATH (§ 98*)—DAMAGES—MEASURE OF RECOVERY.

A recovery of $8,000 for the wrongful death of a man 38 years old and in perfect health, and earning from $1.65 to $3 per day, who left a widow and three children, the eldest

of whom was six years, was inadequate, and should be increased to $10,000.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 124; Dec. Dig. § 98.*]

Appeal from Fifteenth Judicial District Court, Parish of Calcasieu; Winston Overton, Judge.

Action by Sayona Nations, individually, etc., against the Ludington, Wells & Van Schaick Lumber Company. From a judgment for plaintiff, defendant appeals, and plaintiff files an answer to the appeal. Modified and affirmed.

Gustave Lemle, W. Catesby Jones, and Arthur A. Moreno, all of New Orleans, and Pujo & Williamson and Cline, Cline & Bell, all of Lake Charles, for appellant. Kay & Jackson, of De Ridder, Monk & O'Neal, of Leesville, and Thos. C. Plauche, of Lake Charles, for appellee.

PROVOSTY, J. Plaintiff's husband received an injury to his hand while at his work as an employé of the defendant company in its sawmill. He died an hour or so later on the operating table, while chloroform was being administered to him preparatory to an operation upon the injured hand. Plaintiff brings this suit in damages in her own behalf and that of her minor children, issue of her marriage with the decedent, charging that both the injury to the hand and the death were caused by the negligence of the defendant company.

[1] The former clearly was not. The work to which plaintiff's husband was put was very simple. He and another man stood at the side of a roller carrier conveying pieces of sawn timber, and as these came to them they shoved them to one side onto another roller carrier, moving at right angles to the first. For doing this the workman is furnished a pick with a handle to it like that of an ax. He sticks this pick into the piece of timber and pulls it aside. Instead of doing this, the husband of plaintiff took hold of the timber with his hand, and the piece that followed bumped against it and bruised and lacerated it, and, for all the record shows, may have crushed some part of the bone. The extent of the injury is not known because the man died before the physician had made an examination.

He was told by the workman he was with to go to the filing room, where something would be done for him. He started off to go as thus directed, but must have been in great pain, for when met by another witness he was going in the wrong direction, to the lower story of the mill, instead of to the upper story. He was holding the injured hand with the other hand. The witness asked him what was the matter, and he said his hand had been mashed. The witness told him to come and go to the filing room, where some temporary dressing would be done until he could have the attention of the doctor. Instead of immediately following the witness, he stepped down one step on the stairs and sat down holding his hand, showing that his pain must have been very great. Our reason for mentioning these indications of his pain having been intense is that the contention of the defendant company is that his death was caused, not by the unscientific administration of the chloroform, but by nervous shock in combination with the ordinary effect of chloroform. Not finding any one in the filing room who could be of any assistance, they went downstairs, and there came across the foreman, who accompanied the wounded man to the hospital; they going there in a wagon.

How much time was consumed in these perambulations, or elapsed, before the chloroform was begun to be administered, or while being administered, until it was discovered

that the patient had stopped breathing the record does not show. The witnesses make approximative estimates by minutes, but every one knows how unreliable such estimates are. Before going upon the operating table he had sat in a chair waiting until water could be procured that had been sterilized by boiling to wash the wound with, and also until the instruments had been sterilized.

The physician was assisted by his wife, who had graduated as a trained nurse, and by the saw filer of the mill. The latter administered the chloroform. It seems that it was he who usually filled that function on such occasions at this mill. The physician says that the patient had taken the chloroform and gone under complete anæsthesia nicely, and that:

"I watched him as much as I could, considering the position I occupied; and so did my wife. I tried to keep an eye on him all the time as near as possible. I had started to wash and clear up the hand, preparatory to the work, and he quit breathing, and at once I turned everything loose and turned my attention to him in a restorative way, and instituted artificial respiration by extending the arms in this manner, and then drawing them up in this manner, etc. Q. Then I understand you to say the first warning of danger you had was when you suddenly noticed he had stopped breathing? A. Yes. Q. Are you sure that you noticed that almost at the instant he stopped breathing? A. I can't say. It was noticed by my wife and by the anæsthetist. I couldn't say whether I noticed it first or not, but it was observed at least."

The physician gives it as his opinion that the man died from nervous shock and the ordinary effect of chloroform. But he says that when he examined him with a view to ascertain whether he was in a fit condition to be anæsthetized, his condition and heart action were normal, and he exhibited no symptoms of shock. An entirely disinterested physician, of whose testimony there is no criticism, on the part of defendant, testified as follows:

"Q. A man who has been injured in the way designated and a while after the injury, say an hour afterwards, bearing in mind that the man had walked upstairs and downstairs and his pulse and heart are examined and found to be normal, please state whether or not that would indicate at that time a shock from the injury received to the hand. A. It would indicate that the man was not shocked. A man suffering from a shock would show it by his heart and respiration before any other way, by pulse and respiration. There would be no shock without the pulse showing it."

The expert evidence shows that the man exhibited none of the symptoms of shock. On the other hand, the operating physician who naturally puts upon the situation the interpretation least disparaging to himself, admits as follows:

"Q. Did you notice the color of the patient after he died? Was he purple or dark blue? A. He was cyanosed at his death. Q. The color is usually caused by what? A. The— Yes, that man had a paralyzed respiration, his respiratory center was paralyzed, and that left the blood in circulation and left the blood in the venous system."

The man was 38 years old, healthy and strong. We must conclude that his death was caused by the chloroform.

[2] Was it negligence to allow a layman to administer it? The physicians who testified in the case agree that it was an unsafe thing to do; that for the relief of pain it might be done, perhaps, by a layman with safety under the observation of a physician, but not for full surgical anæsthesia. The physician who operated testified that he himself would not have taken an anæsthetic from any of those who were present.

"Q. As a physician you recognized even in this case that it was not safe for a layman to administer chloroform? A. I certainly did. Q. And because of the fact you requested that a physician as an assistant be provided to administer the chloroform? A. I demanded it."

We do not think there can be any serious question but that this allowing a layman to administer the chloroform was the taking of a very great risk, and constitutes negligence if it was avoidable.

In the first place, nothing shows that it was not avoidable in the sense that, rather than take the risk of a layman administering the chloroform, it would have been better not to make the operation at all, but simply to assuage the pain by sedatives.

But, granting that an operation was necessary, and that the anæsthetization was advisable, nothing shows that it was not possible to secure an assistant physician. Half a dozen lived within a couple of miles, and the mashing of a hand, even though ·more aggravated than is shown to have been the case in the present instance, is not so liable to be promptly fatal as not to allow of time in which to summon a neighboring physician; and temporary relief from pain can be given without danger to life. It is said that an effort was made to summon one of the physicians of the town not two miles distant; but the evidence leaves no doubt that no serious effort was made, and that the saw filer was supposed to be entirely competent in the premises.

[3] The decedent was negligently dealt with. On whom rests the responsibility?

The attending physician said he demanded an assistant of the assistant superintendent of the mill, of the brother of the dead man, and of the man himself. He is mistaken when he says that he made the demand of the brother of the wounded man. The evidence shows that the wounded man sent some one to call this brother, but that when the brother arrived the patient was already anæsthetized. The man himself was in intense pain, and hardly in a position to advise with the physician as to what was, under the circumstances, the best course to pursue.

The responsibility rests, we think, upon the assistant superintendent, who failed to procure an assistant physician, and upon the physician who consented to proceed without competent assistance.

A condition of the employment contract at the defendant's mill was that the company should withhold weekly out of the wages of the employés a certain amount to go towards a fund for securing medical aid for the employés in case of need. The company itself contributed no part towards the fund, but derived no profit therefrom, save perhaps in the betterment brought about thereby in its labor conditions. Beyond making this weekly contribution the employés took no part in the procuring of the medical aid. The company retained that function in its own hands.

This was a business arrangement between the parties; and a part of the company's understanding was to use due care in providing the employé with a competent physician, or with two if need were. The Supreme Court of Missouri, in the case of Phillips v. St. Louis, etc., R. Co., 211 Mo. 419, 111 S. W. 109, 17 L. R. A. (N. S.) 1167, 124 Am. St. Rep. 786, 14 Ann. Cas. 742, has held that the company in such a case must go beyond employing a competent physician; that it "must go further and competently treat the patient." But the weight of authority seems to be that:

"Where an employer derives no profit from the retention of the hospital fund from its employés, it is liable only for failure to exercise ordinary care to select, employ, and retain a competent physician."

This, however, means, of course, that if a case necessitates the services of two physicians, then that due care must be exercised in providing the two.

In the present case the company clearly failed in its duty to provide this second physician. No effort, or, if any, only a mere perfunctory one, seems to have been made in that regard. The attending physician "de-

manded" of the assistant superintendent that it be done, and it was not done.

[4, 5] The attending physician himself was a mere substitute for the regular physician, who was off on a month's holiday. He was not a registered physician of the state. Defendant's learned counsel argue that this did not detract from his competency. No, but it adds to defendant's burden of proof in showing his competency; a prima facie case to the contrary having been made out by the result of his work. Except out of his own mouth not a word is in the record as to his competency. From his own testimony we gather that his nervous condition was then, or had recently been, such that he had had to give up for a time the practice of his profession at the place where he had last been located. From the fact testified to by him of his having repeatedly changed location, we gather that there must have been something detracting from his success. Everything considered, we do not think this physician was such a one as the plaintiff's husband had the right to be furnished with under the agreement with the defendant company.

The view which we have thus taken accords with that of the jury, who allowed $8,000. The plaintiff has filed an answer to the appeal asking that the amount be increased to $16,000.

[6] The earning capacity of the defendant was from $1.65 to $3 a day. He was 38 years old, and in perfect health. He left a widow and three children, the eldest of whom is six years. While we are disinclined to increase the allowance of juries in cases of this kind, yet we must recognize that $8,000 is inadequate. We increase the amount to $5,000 for the widow and $5,000 for the children, $10,000 in all.

It is ordered, adjudged, and decreed that the judgment appealed from be increased to $10,000, and that as thus increased it be affirmed. Defendant to pay all costs.