Staunton.

VIRGINIA IRON, COAL AND COKE CO., ET AL, V. ODLE'S ADM'R.

September 16, 1920.

1. MASTER AND SERVANT—*Agency—Agent and Servant Distinguished.*
   —There is a well-defined distinction between an agent and a
   servant. Usually an agent represents his principal in the
   formation or discharge of contracts with third persons, while
   a servant performs mere operative or mechanical acts under
   the direction and control of the master which may result in im-
   posing a liability on the master on account of an existing
   obligation resting upon the master.

2. MASTER AND SERVANT—*Physician Employed by Coal Company—
   Whether Servant, Agent or Independent Contractor.*—A doctor
   employed by a coal company to attend its miners and paid by
   the company from a fund created by monthly deductions from
   the earnings of each miner, occupies neither the position of
   agent nor servant of the company, but rather that of an inde-
   pendent contractor. Nevertheless, the company would not be
   excused from liability for the doctor's acts or negligence if the
   company was under a contractual obligation not merely to em-
   ploy a competent physician, but to furnish the employees skill-
   ful medical treatment in case of sickness.

3. MASTER AND SERVANT—*Respondeat Superior—Doctor Employed
   by Coal Company.*—The doctrine of *respondeat superior* has no
   application to the case of neglect by a doctor employed by a
   coal company to attend its miners in sickness.

4. MASTER AND SERVANT—*Medical Attention.*—In the absence of con-
   tract a master is under no obligation to provide medical attend-
   ance for his sick servant.

5. HOSPITALS AND ASYLUMS—*Liability to a Patient for Negligence
   or Malpractice.*—The immunity of a charity hospital from lia-
   bility to a patient for the negligence or malpractice of one of
   its physicians or surgeons rests on an implied contract on the
   part of the patient to assume the risk.

6. SHIPS AND SHIPPING—*Negligence of Ship's Doctor.*—Neither the
   owners nor the master of the steamship are liable for the
   negligence or malpractice of the ship's doctors resulting in
   damages to a passenger, provided due care was observed in
   the selection and retention of the doctor.

7. MASTER AND SERVANT—*Physicians and Surgeons—Liability of Master for Negligence of Doctor.*—If the services of a physician are furnished as a *pure gratuity*, the master paying the physician and simply offering his services, the master is not liable for the negligence or mistakes of the physician, if ordinary care has been used in his selection and retention.

8. MASTER AND SERVANT—*Relief Fund—Liability of Master for Negligence of Doctor.*—Where a "relief fund" is created by deductions from the wages of employees and contributions are made by the master to provide medical attention and for disability and death benefits of its members, but membership is optional with employees, and the master agrees to make up all deficiencies necessary to the maintenance of the fund, and, in consideration thereof, the members agree that the master is not to be liable to actions for damages for their injury or death while employed by the master, the master is not liable for the negligence or malpractice of the doctor, though chosen by him and subject to discharge by him, if he used ordinary care in the selection and retention of the doctor.

9. MASTER AND SERVANT—*Physicians and Surgeons—Liability of Master for Negligence of Doctor.*—If deductions are made from the wages of the employee, and the whole fund is turned over to the physician for his services in furnishing medical and surgical attention to the employee and his family—the master simply collecting and paying over the fund, and neither receiving nor expecting any profit therefrom, though employing the physician and having the right to discharge him—the master is not liable for the negligence, mistakes, or malpractice of the physician, if ordinary care was observed in his selection and retention.

10. MASTER AND SERVANT—*Physicians and Surgeons—Liability of Master for Negligence of Doctor.*—If deductions are made from the wages of employees, and the whole fund is not turned over to. a physician for his services in furnishing medical and surgical attention to the employees and their families, but the fund is administered by the master for the benefit of his servants, with no direct pecuniary profit or the expectation thereof to the master; as for example, where there is a hospital to maintain, the master is only liable for ordinary care in the selection and retention of the physician, and is not liable for the malpractice of the physician. ·

11. MASTER AND SERVANT—*Physicians and Surgeons—Liability of Master for Negligence of Doctor.*—The incidental benefit derived by the master from the increased efficiency of the service is not such a profit as will render the master liable beyond ordinary care in the selection and retention of a physician.

36

12. MASTER AND SERVANT—*Physicians and Surgeons—Liability of Master for Negligence of Doctor.*—Where deductions are made by the master out of the wages of his employees for medical and surgical care and attention, if the master is so conducting this branch of business as to make a pecuniary profit out of it for himself, or if he contracts that *he will furnish* and provide competent medical and surgical attention, the master is liable to the servant for injury resulting from the neglect or malpractice of the physician or surgeon employed by him.

13. MASTER AND SERVANT—*Physicians and Surgeons—Liability of Master for Negligence of Doctor—Case at Bar.*—In the instant case plaintiff sought to bring his case within the principle announced in the next preceding syllabus, involving the elements both of the contract and profit; but the evidence did not establish a personal undertaking on the part of his employer, a coal company, to furnish competent medical attention to its employees, but only to provide a competent physician whose services should be available to them, without additional charge, and there was no sufficient evidence to sustain the allegation of the plaintiff that the company made, or expected to make, a profit on the transaction.

*Held:* That master was not liable.

14. MASTER AND SERVANT—*Physicians and Surgeons—Liability of Master for Negligence of Doctor—Case at Bar.*—In the instant case the evidence showed that plaintiff's intestate and other miners employed by defendant company understood the agreement on the part of the company to be that, in case of sickness, a miner was to receive the care and attention of the company doctor free of charge. There was no evidence that the company had notice of the failure or neglect of the company doctor to attend the decedent when requested; nor was there evidence of the doctor's incompetency or of a profit or expectation of profit derived by the company.

*Held:* That if the doctor was competent, but negligent in the particular case of decedent, and there was no contract for medical service except that of the company doctor, the company was not liable for the doctor's negligence.

15. MASTER AND SERVANT—*Physicians and Surgeons—Liability for Negligence or Malpractice of Doctor—Mining Companies.*—Physicians, surgeons, and medical hospitals operated for profit hold out to the world their capacity to furnish skillful medical and surgical treatment, and are liable for the malpractice and negligence of themselves and their employees; but a mining corporation is engaged in an entirely different business. But a mining company may, for consideration, enter into a contract with its employees absolutely to furnish medical attention at all times during their service. Such a contract

is not *ultra vires*, and under it the company is liable for the malpractice and negligence of a physician employed by it. But such a contract with a mining company must be proved, it will not be readily implied.

16. ASSIGNMENT OF ERRORS—*Sufficiency.*—Parties who complain of errors in the trial court must point them out with such certainty as will enable this court to say from the assignment as made whether or not the alleged error has been duly assigned. The Supreme Court of Appeals will neither presume error nor enter upon a voyage of discovery through the record to ascertain whether or not error has been committed.

17. ASSIGNMENT OF ERRORS—*Question to Witness—Pointing Out Error.*—It is not sufficient to say that the trial court erred in permitting a designated question to be asked a witness, unless the error is manifest, or it is pointed out wherein the error consists.

18. INSTRUCTIONS—*Master and Servant—Physicians and Surgeons—Refusal of Company's Doctor to Attend Employee.*—In an action by a miner's administrator against a coal company for the neglect of the company's doctor in failing to attend him when requested, an instruction given for the plaintiff is erroneous where it makes any refusal on the part of the doctor a ground of liability to the plaintiff. The instruction should have been any refusal on the part of the doctor "without good and sufficient cause," or words to that effect. That the refusal was for good and sufficient cause was the gravamen of the defense, to which much of the evidence was directed, and, if it was not error, it was misleading not to embrace it in the instruction.

19. PHYSICIANS AND SURGEONS—*Duty to Patient.*—It cannot be said as a matter of law that the duty of a doctor to a patient critically ill is paramount to his duty to other patients who are also ill unless the latter are in equal danger. Doctors cannot always measure or compare the degree of danger of one patient with another, and this is especially true in cases of pneumonia.

20. DEATH BY WRONGFUL ACT—*Damages—Physical Pain and Mental Anguish.*—Lord Campbell's act, and the acts of the States modeled after it, in giving a right of action for death caused by the wrongful act or neglect of another, created a new and original right of action in the surviving relatives of the deceased, and not a mere survival of the cause of action which had previously existed in the decedent. Therefore, in this new action given by the statute, the plaintiff cannot recover for the physical pain and mental anguish of the decedent. The mental anguish of the beneficiaries may be increased by the men-

tal and physical suffering of the decedent and they may recover damages therefor, but it is their mental anguish and not the physical pain and mental anguish of the decedent for which recovery is allowed.

21. APPEAL AND ERROR—*Judgment in Appellate Court.*—Where the facts proved do not establish any liability upon one of the defendants, and the evidence was as full as the circumstances of the case admitted of, and as could be reasonably expected on another trial, and full opportunity was afforded the plaintiff to introduce evidence, the Supreme Court of Appeals on reversal will, under section 6365 of the Code of 1919, render judgment of dismissal as to that defendant.

Error to a judgment of the Circuit Court of Wise county in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Lewis A. Nuckols* and *Fulton & Vicars,* for the plaintiffs in error.

*Werth & Werth,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

The plaintiff's intestate was employed by the Virginia Iron, Coal and Coke Company to work in its mines in Wise county. While so employed he was taken sick and died. This action was brought against the company and the doctor employed by it to attend the miners, on the ground that the doctor had negligently failed to render the necessary medical attention to the decedent, and that such negligence caused or proximately contributed to decedent's death. There was a verdict and judgment for the plaintiff for $5,000, and to that judgment the writ of error in this cause was awarded.

There was no express contract between the parties, written or oral, and there is some conflict in the testimony as to what was done or omitted by the doctor, but we think the decided weight of the testimony, so far as it affects this case, shows that the decedent, James A. Odle, was in the employment of the company at the time of his death, and had been for upwards of twenty years; that during all this time the company had employed one or more doctors to attend the miners in case of injury or sickness; that there was deducted from the earnings of each miner, including the decedent, each month a small sum, which went into the treasury of the company, and that in consideration thereof the miner, in case of sickness, was entitled to receive medical attention and treatment, and also all necessary medicine, free of any additional charge. The money thus deducted each month went into the treasury of the company, without accountability to the miners, and the miners had no voice in the selection or discharge of the doctor. The company undertook to employ a competent doctor, or doctors, and the miners had attendance and treatment from him or them whenever and as often as in need thereof. James A. Odle, the plaintiff's intestate, was taken sick on Sunday, October 13, 1918, and died Thursday, October 24, 1918. He sent for Dr. D. A. Dunkley, the "company doctor," on Monday, October 14, and each day that week. The messenger stated the symptoms of the intestate, and the doctor sent him medimine on Monday and gave directions as to treatment. The messenger reported from day to day that the patient was no better, and asked him to go to see the patient who was very sick, but the doctor did not go, though on another day he again sent medicine. On each occasion on which he was urged to go to see the patient, the doctor explained that he could not get off on account of the great amount of sickness in the camp, and that he "had more work to do than he

could do." The decedent lived five miles or more from the doctor's office, and it would have required the greater part of the half of a day to have made the trip. Finally, the doctor did go on Sunday, October 20th, examined the patient carefully, found that he had bronchial pneumonia, which is double pneumonia, and prescribed for him. He made no other visit to him, though requested to do so, and the patient died on the following Thursday, October 24th. The doctor testifies that he did not go to see him again after Sunday simply because he had so many patients at the camp he could not look after all of them, and that several of them were just as sick as Mr. Odle, and that he had done everything for the latter he could do. Dr. Pierce testified on behalf of the plaintiff that he saw the intestate on the morning of the day he died, and that "he was dying with yellow jaundice," but there is other evidence in the record to the effect that the decedent had "influenza," which was followed by pneumonia, resulting in his death.

The company had a large number of employees and usually employed one physician and an assistant at the Tom's Creek plant, where decedent was employed, but when war was declared with Germany in 1917, young doctors were drafted and an appeal was made to those not within the draft to volunteer. Appeal was also made to the patriotism of the mining and manufacturing companies to reduce their medical staffs to the minimum of necessity. Under these circumstances, Dr. Carr, who was the assistant at Tom's Creek, was drafted and left the company and entered the military service of the United States. The company was operating several plants near to each other, and it was thought that, under normal conditions, they could be adequately cared for by rendering each other assistance when needed, and this arrangement was made. But in the early fall an epidemic of what was termed "influenza" spread over the country, producing an unprecedented amount of

sickness, and a very large number of cases of pneumonia and death. The testimony in the record shows that in the Tom's Creek plant there were 3,000 cases of "influenza," many cases of pneumonia, and forty-seven deaths. The record shows that as soon as the disease made its appearance at Tom's Creek, every reasonable effort was made to get medical assistance with but poor success. The same necessity which called for such assistance at Tom's Creek called for it all over the country, and rendered the demand for doctors far in excess of the supply. Appeals were made to the Surgeon-General of the United States, to the State board of health, to the members of Congress from that district, and to private sources, and when the appeal to the Surgeon-General proved unavailing, the matter was taken up with the Fuel Administration, which was urging the production of the greatest amount of coal possible. Finally, there was obtained for the Tom's Creek plant one elderly doctor, who was not able to visit points at a distance or at night, a medical student from the University of Virginia, and one trained nurse. These were the conditions at the time the decedent was sick. At that time there were between 500 and 600 cases on "influenza" at Tom's Creek, and at least five or six cases of pneumonia.

[1-4] It is insisted by counsel for the defendant in error that the doctor was the agent of the company, and that "failure on the part of this agent to perform the services contracted for by his principal is negligence and a breach of the contract for which the principal is liable." Apparently, the word "agent" in the paragraph quoted is used in the generic sense of representative, but the representative may be what is usually and properly termed an agent, or he may be a servant. There is a well defined distinction between the two. Usually an agent represents his principal in the formation or discharge of contracts with third persons, while a servant performs mere operative or mechani-

cal acts under the direction and control of the master which may result in imposing a liability on the master on account of an existing obligation resting upon the master. The distinction between an agent and a servant is fully set out in Huffcut on Agency (2d ed.), sec. 4, where, amongst other things, it is said: "An agent represents his principal in an act intended, or calculated, to result in the creation of a voluntary primary obligation or undertaking. A servant represents his master in the performance of an operative or mechanical act of service, not resulting in the creation of a voluntary primary obligation, but which may result, intentionally or inadvertently, in the breach of an existing one." It is quite manifest that the doctor did not occupy the position of agent in this sense. It seems equally clear that he was not a servant of the company. A servant is bound to obey the uncontrolled will and directions of the master in all its details, and in the means and methods to be used by the servant in the performance of his work. The doctor was not employed to do ordinary operative or mechanical acts, but to render professional services requiring special education and training, and involving the exercise of skill and judgment, which could not, in the nature of things, be controlled by the will and direction of the company. As said in *Quinn* v. *Railroad Co.*, 94 Tenn. 713, 30 S. W. 1036, 28 L. R. A. 552, 45 Am. St. Rep. 767. "To perform these services so as to make them effectual for the saving of life or limb it was necessary that these surgeons should bring to their work not only their best skill but the right to exercise it in accordance with their soundest judgment and without interference. Not only was this the right of these surgeons, but it was as well the duty that the law imposed. If the railroad authorities had undertaken to direct them as to the method of treatment of the injured man, and this method was regarded by them as unwise, they would have been 'bound to exercise their own superior

skill and better judgment and to disobey their employers, if in their judgment, the welfare of the patient required it.' *Union Pac. R. Co.* v. *Artist,* 60 Fed. 365." The doctrine of *respondeat superior* has no application to the case. *Neil* v. *Flynn Lumber Co.,* 71 W. Va. 708, 77 S. E. 324, 325, 93 Am. St. Rep. 657. The position of the doctor was rather that of an independent contractor. But this would not excuse the company from liability for his acts of neglect if the company was under a contractual obligation not merely to employ a competent physician, but to furnish the employee skillful medical treatment in case of sickness. "If the employer by express contract has agreed to do an act efficiently and safely, he cannot, by subletting the work to an independent contractor, relieve himself from liability under his express contract." Huffcut on Agency (2d ed.), sec. 223; 76 Am. St. Rep. 408, and cases cited. In the absence of contract the master is under no obligation to provide medical attendance for his sick servant. It becomes necessary, therefore, for us to inquire what was the contract between the parties.

As there was no express contract, oral or written, we are compelled to ascertain the terms of the contract as best we may from the conduct and dealings of the parties with each other. The company owned and operated a number of mining plants. For some years it deducted monthly from the pay of the miners fifty cents a month for single men and one dollar a month for each man with a family. A few years ago it erected and equipped a hospital for surgical cases. After the erection of the hospital, the deductions were seventy-five cents a month for a single man and one dollar and twenty-five cents for men with families. On the statements furnished the miners, the deductions are marked "physician." The amount of these deductions went into the treasury of the company, which employed the physician. The vice-president of the company testifies as to how the

37

accounts were kept and the money expended, and states that no profit has ever been made by the company out of this account since he has been connected with the company as the vice-president, and there is no evidence of any profit to the company from that account at any other time. In the absence of an express contract, the plaintiff examined a number of miners to ascertain their understanding as to what they were to receive in return for the deductions from their wages. Their answers to this question were: "If he was sick or hurt the doctor was supposed to wait on him * * * married men living in the camp * * * the doctor was to take care of the whole family." Another witness testified: "I expected if I got sick for the doctor to come and see me and treat me if I needed treatment." Another witness was asked and answered as follows: "During all that time has it or not been your understanding that you were to receive visits and treatment from the doctor in case you needed such for that deduction? Yes, that was my understanding." Another witness states: "I expected the services of a physician when I needed him." A number of other witnesses testified to the same effect, but none of the answers is any more specific than those given. On all previous occasions the "company doctor" has always responded to all calls made upon him by the miners. From the testimony, the plaintiff deduces a contract on the part of the company to provide medical treatment to the decedent at all events when he was sick, and argues that the failure of the doctor to visit him was the failure of the company to fulfil its contractual obligation for which it must respond in damages. The company, on the other hand, claims that it was under no obligation to do more than provide a competent physician to attend the miners and keep him at the plant available to their calls, and that it did this, and if the physician negligently failed to answer the calls made upon him by the plaintiff's intestate, without notice or information to it of such neglect, there is no liability upon the company.

If, as the plaintiff claims, there was a personal undertaking on the part of the company "to treat"—that is "to furnish competent and skillful medical treatment for" the decedent—and there was a breach of the undertaking, the company cannot shelter itself under the doctrine of "independent contractor," and must respond in damages, unless some sufficient excuse for non-performance is shown, but if the contract was as claimed by the company, there can be no recovery against it, as it is not claimed that the physician employed by the company was incompetent. The plaintiff rests his case on the ground that the physician employed by the company negligently failed to respond to the calls upon him by decedent for medical treatment, and that for this negligence the company is liable under its contract.

There have been many decisions involving questions more or less similar to those in the instant case, and, while it would not be practical to review them all, a classification, or a partial classification, of them will serve to show the questions which have arisen and the views of the courts thereon.

[5] 1. What constitutes a charity hospital and the extent of its liability to a patient therein for the negligence or malpractice of one of its physicians, or surgeons, was fully considered by this court in the able opinion of its president, Judge Keith, in *Hospital of St. Vincent* v. *Thompson*, 116 Va. 101, 81 S. E. 13, 51 L. R. A. (N. S.) 1025. It was there held that the immunity of the hospital from liability to a patient rested on an implied contract on the part of the patient to assume the risk. We are satisfied with the conclusions there reached, though it is conceded in the opinion that much of its discussion is *obiter*. The instant case, however, is not within that class.

[6] 2. Neither the owners nor the master of the steamship are liable for the negligence or malpractice of the ship's doctors resulting in damages to a passenger, provided due

care was observed in the selection and retention of the doctor. The reason is that "it is optional entirely with the passengers whether or not they employ the physician. They may use his medicine or not as they choose. They may place themselves under his care, or go without attendance, as they prefer, and they determine themselves how far and to what extent they will submit to his control and treatment. The captain of the ship cannot interefere. The physician is not the ship-owner's servant, doing his work and subject to his direction. In his department, in the care and attendance of the sick passengers, he is independent of all superior authority except that of his patient, and the captain of the ship has no power to interfere except at the passenger's request." *Allan* v. *State Steamship Co.*, 132 N. Y. 91, 30 N. E. 482, 15 L. R. A. 166, 28 Am. St. Rep. 556; *Laubheim* v. *Steamship Co.*, 107 N. Y. 229, 13 N. E. 781, 1 Am. St. Rep. 815; *O'Brien* v. *Cunard Steamship Co.*, 154 Mass. 272, 28 N. E. 266, 13 L. R. A. 329. The same principle applies where the same option exists. Thus, in *Pittsburg, etc., R. Co.* v. *Sullivan,* 141 Ind. 83, 40 N. E. 138, 27 L. R. A. 840, 50 Am. St. Rep. 313, it was held that the company having assumed the duty to provide a physician and tender his services to its sick or injured employees, which they were free to reject or accept—a duty which was voluntarily assumed, and one which was not due from the company to its employees—its liability cannot be extended beyond its negligence, if any, in the selection of the physician or surgeon; that it was not liable for the negligence or tortious acts of the physician in the treatment of its servants who had accepted his professional services. This is really not a separate class, but an illustration of the next succeeding class, and is only given a separate classification because of its distinctive character.

[7] 3. If the services of a physician are furnished as a *pure gratuity,* the master paying the physician and simply

offering his services, the master is not liable for the negligence or mistakes of the physician, if ordinary care has been used in his selection and retention. *Quinn* v. *Railroad Co.,* 94 Tenn. 713, 30 S. W. 1036, 28 L. R. A. 552, 45 Am. St. Rep. 767; *Pittsburg, etc., R. Co.* v. *Sullivan, supra; Louisville, etc., R. Co.* v. *Foard.* 104 Ky. 456, 47 S. W. 342; *Secord* v. *St. Paul, etc., R. Co.* (U. S. Cir. Ct. Minn.), 18 Fed. 221; *Railroad Co.* v. *Artist,* 9 C. C. A. 14, 60 Fed. 365, 23 L. R. A. 581.

[8] 4. Where a "relief fund" is created by deductions from the wages of employees and contributions are made by the master to provide medical attention and for disability and death benefits of its members, but membership is optional with employees, and the master agrees to make up all deficiencies necessary to the maintenance of the fund, and, in consideration thereof, the members agree that the master is not to be liable to actions for damages for their injury or death while employed by the master, the master is not liable for the negligence or malpractice of the doctor, though chosen by him and subject to discharge by him, if he used ordinary care in the selection and retention of the doctor. This is said to be a business transaction, in the nature of a benefit society. *Maine* v. *Chicago, etc., R. Co.* (1897) 109 Iowa 260, 70 N. W. 630, 80 N. W. 315; *Haggerty* v. *St. Louis, etc., R. Co.* (1903), 100 Mo. App. 424, 74 S. W. 456.

[9] 5. If deductions are made from the wages of the employee, and the whole fund is turned over to the physician for his services in furnishing medical and surgical attention to the employee and his family—the master simply collecting and paying over the fund, and neither receiving nor expecting any profit therefrom, though employing the physician and having the right to discharge him—the master is not liable for the negligence, mistakes or malpractice of the physician, if ordinary care was observed in his selec-

tion and retention. *Guy* v. *Lanark Fuel Co.,* 72 W. Va. 728, 79 S. E. 94, 48 L. R. A. (N. S.) 536; *Eastman Gardiner Co.* v. *Permenter,* 111 Miss. 813, 72 So. 234; *Wells* v. *Ferry-Baker L. Co.,* 57 Wash. 658, 107 Pac. 869, 29 L. R. A. (N. S.) 426; *Simon* v. *Hamilton L. Co.,* 76 Wash. 370, 136 Pac. 361; *Engirbritson* v. *Tristate Cedar Co.* (1916), 91 Wash. 279, 157 Pac. 677; *Arkansas, etc., R. Co.* v. *Pearson,* (1911), 98 Ark. 399, 135 S. W. 917, 34 L. R. A. (N. S.) 317. The cases cited generally state that there is no liability on the master, under the conditions stated, if he "derived no profit" from the transaction, but in the last mentioned case it is said that the rule might be different if the company did in fact realize a profit therefrom, or "if it agreed and contracted with such employees, in consideration of the fees paid by them to furnish proper medical attention;" and in *Big Stone Gap Iron Co.* v. *Ketron,* 102 Va. 23, 26, 45 S. E. 740, 741 (102 Am. St. Rep. 839), in holding the company exempt, it was said, "there is no evidence that the company derived, *or expected,* any advantage or profit from the fund so created." (Italics supplied.)

[10] 6. There are many cases where the whole fund is not turned over to the physician, but the fund is administered by the master for the benefit of his servants, with no direct pecuniary profit or the expectation thereof to the master; for example, there may be a hospital to maintain. Here the master is only liable for ordinary care in the selection and retention of the physician. Thus in *Poling* v. *San Antonio R. Co.* (1903), 32 Tex. Civ. App. 487, 75 S. W. 69, where a servant lost the sight of an eye by the alleged negligent treatment of the physician employed by the company, it was held that where a railroad company retained a certain sum monthly from the wages of its employees as a hospital fee, to be used in the care and treatment of its servants who were injured or became sick while in its service, but derived no profit from the fund, it was only required to use

ordinary care in the selection of the physician, and was not liable for his malpractice; and in the well considered case of *Arkansas, etc., R. Co.* v. *Pearson* (1911) 98 Ark. 399, 135 S. W. 917, 34 L. R. A. (N. S.) 317, it was held that where the company derived no profit or gain, nor the hope thereof from the monthly deductions made for hospital fees, the company was a mere trustee to administer the hospital fund and was not liable for the negligence or malpractice of a physician employed by it if due care was used in his selection. A number of cases are cited to support the opinion, including *Big Stone Gap I. Co.* v. *Ketron, supra,* and the case is reaffirmed in *St. Louis, etc., R. Co.* v. *Taylor* (1914), 113 Ark. 445, 168 S. W. 564.

In *Congdon* v. *Louisiana Sawmill Co.,* 143 La. 209, 78 So. 470, the question was as to the sufficiency of the complaint to state a case against the defendant company. The plaintiff alleged in the complaint "that in this case, as was and had been customary with all employees of said company, the said company retained out of petitioner's wages a certain sum of money for the specific purpose of insuring medical aid and treatment for petitioner whenever it became necessary and expedient for him to have the same." The fund thus established was to be "used solely and exclusively by the company with which to employ a physician to look after the health of its employees," and that petitioner had nothing to do with the employment of the physician or fixing his salary, and the fund was under the sole and exclusive management and control of the company, and the physician so employed by it was alone responsible to said company. There was a demurrer to the petition on the ground that it did not state a case. This demurrer was sustained, the court saying, "the plaintiff does not allege that the defendant derived any profit from the employment of the physician employed by it out of the fund created for the purpose of paying the physician's salary. He does not allege that the

defendant failed to exercise ordinary care in its selection of the physician to treat the injured and sick employees; he does not even allege that Dr. Broadway, the physician selected by the defendant, was an incompetent physician. These were necessary allegations to show cause of action by him against defendant." It is further said, "under the decisions the employer can be made to respond in damages in such case only in the event that he fails to exercise ordinary care in the selection of the physician, or in the event that he derived a pecuniary profit out of the fund." Further, in the course of the opinion, it is said: "We might refer to a long line of decisions holding that 'where a master employs a surgeon for the benefit of its men and without profit to itself, it is not liable for the surgeon's malpractice in case it exercises reasonable care in the selection of a competent surgeon.'" For this latter proposition a large number of cases are cited, many of which are also cited and reviewed in this opinion.

In 5 Labatt's M. & S. (2d ed.), sec. 2005, it is said that "the master may make deductions from the wages of his servants, and, without any direct pecuniary profit from the fund thus created, administer it for the benefit of those who fall sick or sustain injury while in his employment. The decided preponderance of authority is in favor of the doctrine that, under an arrangement of this character, he is not accountable for the negligence or unskillfulness of the physicians or surgeons employed by him, unless he has failed to exercise due care in selecting them."

In 21 R. C. L., sec. 40, page 396, it is said, among other things, "But where one is under a contractual or statutory duty to furnish to another medical or surgical aid, the authorities are unanimous in support of the conclusion that, if he acts in good faith and with reasonable care in the selection of the physician or surgeon, and has no knowledge of incompetency or lack of skill or want of ability on the part

of the person employed, but selects an authorized physician in good standing in his position, he has filled the full measure of his contractual or statutory duty, and cannot be held liable for any want of skill on the part of the person employed. In such case it seems that the duty would be fulfilled by furnishing to the patient an independent contractor, and that the physician will be held to be such."

In *Big Stone Gap Iron Co.* v. *Ketron, supra,* it is said: "It appears that each married employee was required, as we have said, to pay $1.00 a month out of his wages, and each unmarried employee the sum of fifty cents a month out of his wages, to be paid for the services of a physician or surgeon to attend them and their families, as their needs required. There is no evidence that the company derived or expected any advantage or profit from the fund so created. In the selection of the surgeon it was the duty of the company to exercise reasonable care, and the presumption is that this duty was performed in the absence of evidence to the contrary. There is no evidence in the record with respect to the fitness of Dr. Johnson except the testimony with respect to his treatment of the injury sustained by the defendant in error.

To hold the company liable for the incapacity of the surgeon it was necessary to aver and prove (1) that it was guilty of negligence in selecting an unfit surgeon; (2) if reasonable care was exercised in the selection of the surgeon who afterwards proved incompetent, notice of his incompetency by reason of inherent unfitness, or by previous specific acts of negligence from which incompetency might be inferred; or (3) through actual notice to the master of such unfitness or bad habits, or constructive notice by showing that the master could have known the facts had he used ordinary care and oversight and supervision, or by proving the general reputation of the surgeon for incompetency or negligence; and (4) that the injury complained of resulted

from incompetency proved. 'The mere fact of the incompetency of a servant for the work upon which he was employed is not enough to warrant a jury in finding the master guilty of negligence in employing him. * * * Evidence of only one other negligent act of the servant in fault is not usually sufficient * * *' Shearman & Redfield on Negligence, sec. 192; *Meyers* v. *Falk,* 99 Va. 385, 38 S. E. 178."

In the *Ketron Case,* the facts do not appear in the opinion except to the extent that they are given in the foregoing quotation, but an examination of the original record in the case discloses the fact that there, as here, there was no express contract between the parties. The whole contract was gathered from the following questions put to Ketron and his answers thereto: Q. "State whether or not you paid this Big Stone Gap Iron Co. anything for medical and surgical aid and attention. Tell what arrangement, if any, you had with that company about that?" A. "The arrangement was that I had to let a dollar go out of each month's wages." Q. "That was to go for the payment of the physician and surgeon?" A. "Yes, sir." The action there was for negligence of the doctor in improperly setting the plaintiff's leg, but the company was held not liable as there was no evidence of the want of due care in the selection and retention of the physician employed by the company. The principle upon which the company in that case was held not liable for the malpractice of the surgeon would seem to apply to the case at bar.

[11] 7. It is generally, but not universally, held that the incidental benefit derived by the master from the increased efficiency of the service is not such a profit as will render the master liable beyond ordinary care in the selection and retention of the physician. See cases hereinbefore cited.

[12] 8. There are a number of cases holding that where deductions are made by the master out of the wages of his employees for medical and surgical care and attention, if .

the master is so conducting this branch of the business as to make a pecuniary profit out of it for himself, or if he contracts that *he will furnish* and provide competent medical and surgical attention, the master is liable to the servant for injury resulting from the neglect or malpractice of the physician or surgeon employed by him. In *Texas & Pac. Coal Co.* v. *Connaughton,* 20 Tex. Civ. App. 642, 50 S. W. 173, an injured miner sued for damages resulting from improper treatment by the physician employed by the company, and was allowed to recover. The undertaking of the company was said to be "to treat and care for properly and in a skillful manner said employees in case of sickness or injury." In the opinion it is said: "The true relation between the company and its employees, as we understand, was this: In consideration of a reduction of wages of all the men employed, and the profit to be made by the company, it bound itself to furnish medical treatment to such of them as should get hurt or become sick while working for the company. It should, therefore, bear the loss of improper treatment, since the law implies, in such cases, an undertaking to give proper treatment." In that case it was said that "the money so paid by the employees, or reserved by the company, yielded the company a profit, above all expenses, of several thousand dollars, which went to its credit in bank together with other monies of the company."

In *Tex. & Pac. Coal Co.* v. *McWaine,* 57 Tex. Civ. App. 512, 124 S. W. 202, the company was held liable for the maltreatment of the plaintiff by the doctor employed by it in setting a broken arm, because the company, for a valuable consideration, to-wit, the monthly deduction of fifty cents, had contracted to furnish the plaintiff careful medical treatment. The case is one of breach of contract to do a specific thing and is rested on a former holding of the same court in *Zumwalt* v. *Tex. Cen. R. Co.,* 56 Tex. Civ. App. 567, 121 S. W. 1133, 132 S. W. 112.

*Sawdey* v. *Spokane, etc., R. Co.,* 30 Wash. 349, 70 Pac. 972, 94 Am. St. Rep. 880, involved both the element of contract and of profit. The facts are very similar to those in the instant case, except that in that case it is said that the "deductions exceeded by a considerable sum the amount expended in the care of its sick and injured employees. There was a directed verdict for the defendant. In the course of the opinion it was said: "If, in this case, the respondent did contract, for a consideration, to treat its employees for any injury they might receive while in its employ, it is liable for the malpractice of the surgeon employed to treat the appellant; and this question, we say, should have been submitted to the jury."

In *Phillips* v. *St. Louis, etc., R. Co.,* 211 Mo. 419, 111 S. W. 109, 124 Am. St. Rep. 786, 17 L. R. A. (N. S.) 1167, 14 Ann. Cas. 742, a railway company undertook to furnish medical treatment to its employees in consideration of certain monthly deductions from their salaries, and the company was held liable for the failure of its doctor to properly treat an employee. The second paragraph of the syllabus in 124 Am. St. Rep. 786, which is warranted by the text, is as follows: "A hospital association formed to provide medical services to employees of a certain railroad company, and maintained by involuntary deductions from the wages of those employees, is not exempt from liability to patients by the mere employment of competent surgeons, but it must go further and competently treat the patients received. Such associations occupy the position of ordinary physicians and surgeons." This case is contrary to the rule announced in the *Ketron Case, supra,* and is also repudiated by *Wells* v. *Ferry-Baker Lumber Co., supra.* It is also repudiated in *Nations* v. *Ludington, etc., Co.,* 133 La. 657, 63 So. 257, 48 L. R. A. (N. S.) 531, Ann. Cas. 1916 B, 471, where it is said that the weight of authority seems to be that "where an employer derives no profit from the

retention of the hospital fund from its employees, it is liable only for failure to exercise ordinary care to select, employ and retain a competent physician."

In *Owens* v. *Atlantic Coast Lumber Corporation*, 108 S. C. 258, 94 S. E. 15, the question involved was the sufficiency of the declaration in a case where small deductions were made monthly from the wages of employees by the master for the payment of a physician. The majority of the court there said that on demurrer they must construe the declaration most favorably for the plaintiff, and that so construing it the declaration stated a case of liability on the part of the master for malpractice or negligence of the physician chosen by him, although he had exercised due care in the selection; that the case stated in the complaint showed that the master deducted a certain amount of wages of his servants for the purpose of forming a relief fund, which was so administered as to derive a direct pecuniary profit by the master. Most of the cases cited to support the conclusion of the court are referred to under one or the other heads of this opinion, but we deem it unnecessary to comment upon the case further than to say that there was a dissenting opinion by Chief Justice Gary, which is amply supported by authority, and which, in our judgment, fully answers the position taken by the majority of the court, and clearly states the law as we conceive it to be. In addition to the authorities hereinbefore cited, see the following cited in the dissenting opinion aforesaid: Note IV to *The Kenilworth*, 144 Fed. 376, 75 C. C. A. 314, 4 L. R. A. (N. S.) 49, 7 Ann. Cas. 202; Note to *Schloendorff* v. *Hospital*, 211 N. Y. 125, 105 N. E. 92, 52 L. R. A. (N. S.) 505, Ann. Cas. 1915C, 581.

As to the latter branch of the proposition stated under this head, that where there is a *personal contract to provide competent medical attention*, the master is liable to the servant for injury resulting from the negligence or malpractice of the physician or surgeon employed by him, it is unnecessary to cite authority, as the proposition is elementary and undisputed.

[13] The plaintiff apparently sought to bring his case within the principle of the *Sawdey Case,* involving the elements both of contract and profit, but he failed to prove what he alleged. He alleged that, in consideration of the monthly deductions, the coal company agreed *"to furnish said employees with competent and skillful medical attention,"* as they should from time to time need the same, and that it employed a medical staff which was paid a fixed monthly salary, less than the aggregate amount collected of the employees, "the difference, amounting to a large sum monthly, being retained by defendant company as a *profit on the transaction."* (Italics supplied.)

As we have seen, the evidence does not establish a personal undertaking on the part of the coal company to furnish competent medical attention to its employees, but only to provide a competent physician whose services should be available to them, without additional charge and there is no sufficient evidence to sustain the allegation that the coal company made, or expected to make, "a profit on the transaction."

After an examination of the cases hereinbefore cited, and many others, we are led to the conclusion that the test of the liability of the master is to be found in the unexpressed, but implied, contract of the parties, to be gathered from their relations to and dealings with each other. The company had always employed an adequate number of competent doctors, and no complaint is now made either of the insufficient number of doctors, or of the competency of the ldoctor of whom complaint is made, but only of his negligence in this case. In the course of the examination of the witnesses, counsel for the plaintiff stated: "We are not complaining of Dr. Carr's negligence or anybody else's negligence except Dr. Dunkley's. Prior to the present case, it appears that Dr. Dunkley had always responded to all calls of the miners in case of sickness."

Virginia Iron, etc. Co. v. Odle's Adm'r, 128 Va. 280. 303

Opinion.

[14] We do not wish to attach too much importance to the use of particular words or expressions by inexperienced and uncultured witnesses, but it is significant that from time to time Dr. Dunkley is spoken of and referred to as the "company doctor," and when the different witnesses are asked as to what they expected in return for the deductions from their wages they quite uniformly respond, the services of *the* doctor." No one of the witnesses testifies as to any personal contract to furnish, nor a guaranty that they should receive, proper and skillful medical care and attention. We think the evidence shows that the plaintiff's intestate and other miners understood the agreement on the part of the company to be that, in case of sickness, the miner was to receive the care and attention of the "company doctor" free of charge. There is no evidence that the company had notice of the failure or neglect of Dr. Dunkley to attend the decedent. If then he was negligent in the failure to attend and minister to the decedent, is the company liable for that negligence? We think not. If he was competent, but negligent in the particular case, and there was no contract for medical service except that of the company doctor, the company is not liable for his negligence.

As said in *Big Stone Gap Iron Co.* v. *Ketron, supra,* "there is no evidence that the company derived, or expected, any advantage or profit from the fund so created," and the instant case would seem to come under classification numbered 6 above, where the fund is administered by the master for the benefit of his servants, without profit or the expectation of profit to the master. An arrangement of this kind is for the mutual benefit of the master and the servant. In many of the small plants no resident physician could be obtained except by a deduction method, and if the master is to be held liable in such case for the negligence or malpractice of the physician when he derives no profit, the chances are he will not employ a physician. This would be

a serious detriment, not only to the employee, but to the public as well, which is interested in the general health of the community, and especially in the prevention of the spread of contagious diseases. Of course, the rule would be different if the master were running a hospital or looking after the care of his employees as a business enterprise, with the expectation or hope of a direct pecuniary reward therefrom.

If the business is not conducted for profit, but only for the betterment of the service, the advantages are mutual, and unless the master has contracted for a different service, he ought not to be held to any greater liability than ordinary care in the selection and retention of the doctor. Nor should a contract for a greater liability on the part of a master engaged in a mining or manufacturing business be implied unless the prior dealings and intercourse of the parties clearly warrant it. In the case at bar, the evidence does not justify such implication. On all prior occasions the coal company had always provided an adequate number of competent doctors. The doctors had faithfully discharged their duties and answered all calls made upon them, and there is no evidence that the coal company made or expected any profit from the transaction. So far as disclosed by the testimony, the coal company simply sought the betterment of the service. It is not alleged that there were not enough doctors, nor that the "company doctor" was incompetent, but only that he was negligent, and of this negligence no notice to the company is alleged. The coal company was under no obligation, in the absence of contract, to provide medical attention to the decedent, and, under the circumstances, no contract on its part to be responsible for the negligence complained of will be implied.

[15] Physicians, surgeons and medical hospitals operated for profit hold out to the world their capacity to furnish skillful medical and surgical treatment, and are liable for

the malpractice and negligence of themselves and their employees, but a mining corporation is engaged in an entirely different business. Its officers and managers are not skilled in medicine and surgery, and if they employ a physician or surgeon, they cannot supervise the details of his work nor the manner of executing it. They have not the capacity to do so. The company may, for a consideration, enter into a contract with its employees absolutely to furnish medical attention at all times during their service. Such a contract is not *ultra vires* the powers of the corporation, and if entered into the company is bound by it, and obliged to respond in damages for its breach. Where such is the contract the company is bound for the malpractice and negligence of a physician employed by it. But such a contract with a mining company must be proved, it will not be readily implied.

[16, 17] The petition for the writ of error contains fifty-seven assignments of error, many of which are insufficient because they do not point out the alleged error complained of, and others are applicable only to the liability of the defendant company which has already been adequately considered. Parties who complain of errors in the trial court must point them out with such certainty as will enable this court to say from the assignment as made whether or not the alleged error has been duly assigned. This court will neither presume error nor enter upon a voyage of discovery through the record to ascertain whether or not error has been committed. It is not sufficient to say that the trial court erred in permitting a designated question to be asked a witness, unless the error is manifest, or it is pointed out wherein the error consists. This subject is fully considered in *P. Lorillard Co., Inc.* v. *Clay*, 127 Va. 734, 104 S. E. 384, decided to-day.

[18] Instruction No. 2, given for the plaintiff, was erroneous in making *any* "refusal on the part of Dr. Dunkley"

39

a ground of liability to the plaintiff. The quoted words should have been followed by "without good and sufficient cause," or words to that effect. That the refusal was for good and sufficient cause was the gravamen of the defense, to which much of the evidence was directed, and, if it was not error, it was misleading not to embrace it in the instruction.

[19] Instruction No. 6, given for the plaintiff, was prejudicial to both of the defendants, and it was error to give it. That instruction is as follows:

"The court instructs the jury that the plaintiff bases his alleged right to recover in this case upon the failure of Dr. Dunkley to visit decedent after the alleged repeated request to do so, until the sixth day after the first request. If the jury believe that decedent was entitled to the services of Dr. Dunkley and that his visits were requested, as alleged, and were reasonably necessary, and that it was reasonably possible for Dr. Dunkley to have visited decedent within the mentioned time, and that he had reasonable ground to believe that decedent was or might become seriously ill and liable to die unless he had speedy medical attendance, then his duty to decedent was paramount to his duty to all other patients except those who were equally entitled to his services, and at that time also in equal danger if not attended. And if the jury believe that during the week beginning October 13th, there were only six or eight cases of pneumonia requiring the care of Dr. Dunkley, and that these or other serious cases, equally entitled to his services, did not require his constant attention, then it was his duty to make every reasonable effort to visit decedent during that week; and if the jury believe that he could have done so without endangering the lives of the patients who were equally entitled to his services, without extra pay to him, then it was his duty to do so without regard to other patients who had to pay extra to secure his services and who were

not in a very serious condition; and for any failure of his in this regard, both he and the defendant company would be liable, if it directly contributed to decedent's death, without fault on his part, or on the part of those attending him."

The instruction states a hypothetical case upon which a conclusion is based, that "then his (Dr. Dunkley's) duty to the decedent was paramount to his duty to all other patients except those who were equally entitled to his services and at that time also in equal danger if not attended." If it be conceded that the hypothesis was justified by the evidence and was not misleading, we cannot say as a matter of law, as the instruction does, that the duty of a doctor to a patient critically ill is paramount to his duty to other patients who are also ill, unless the latter are in *equal danger*. Doctors cannot always measure or compare the degree of danger of one patient with another, and this is especially true in cases of pneumonia. Of course, there are cases where one patient is critically ill, requiring immediate attention, and others manifestly not, and here the duty of the doctor is fairly plain, but this cannot be said of the case at bar, where the decedent was ill of double pneumonia five miles from the camp, requiring half a day to visit him and return, and there were five or six cases of pneumonia, and several hundred of "influenza" in the camp requiring the attention of the same doctor. The condition of the different patients would be a proper element, and a very important one, for the doctor to consider, but at last the determination of the question of what the doctor ought to do under such circumstances must in large measure be determined by his judgment, and what should be left to the jury is, did he exercise that judgment in good faith? If there is any doubt as to whether or not he exercised good faith in the determination of his duty, it was a proper subject for inquiry and investigation upon testimony of other doctors, after being informed of the situation and the surrounding cir-

cumstances, or upon other evidence showing or tending to show a lack of good faith; but this court cannot say, as a matter of law, that *equality of danger* is a test to determine the duty of the doctor in a case of this kind. A similar vice appears in the next sentence of the same instruction, wherein it appears that the doctor was stripped of the right and duty to exercise his judgment as to what he ought to do under the circumstances. Dr. Dunkley had six or eight pneumonia patients at the camp and several hundred cases of "influenza." One of the chief dangers of the latter was their tendency to develop pneumonia. It may be that the pneumonia patients "did not require his constant attention," and that he might have visited the decedent "without endangering the lives of the patients who were equally entitled to his services," and yet it still should have been left to his judgment as to whether or not he should have visited the decedent, and the question which should have been left to the jury was his good faith in forming that judgment. It may be that, in looking back upon the events of that time, a jury might conclude that he could, with safety to his other patients, have visited the decedent, but the real question is, what was the opinion and judgment of the doctor at that time, and was that opinion formed in good faith? If he visited other patients in the neighborhood of the decedent during the latter's illness, to whom he owed no duty, for the sake of the extra pay he would get, that was a proper subject of consideration as tending to show his judgment at the time as to safety in leaving his patients at the camp, but the instruction was clearly misleading, if not erroneous, in the form in which it was given.

[20] Instruction No. 8 was also erroneous. This instruction told the jury they might, in fixing the amount of the damages, take into consideration "such further sum as they shall deem reasonable and just compensation for physical pain and mental anguish suffered by decedent," etc. An

instruction to this effect was approved by this court in *Ches. & O. Ry. Co.* v. *Rogers' Adm'x*, 100 Va. 327, 41 S. E. 732, but it is manifest from reading the opinion that the instruction was not carefully considered. In *Anderson* v. *Hygeia Hotel Co.*, 92 Va. 687, 24 S. E. 269, in a carefully prepared opinion by Judge Riely, it is pointed out that Lord Campbell's act, and the acts of the States modeled after it, in giving a right of action for death caused by the wrongful act or neglect of another, created a new and original right of action in the surviving relatives of the deceased, and was not a mere survival of the cause of action which had previously existed in the decedent. It would seem manifest, therefore, that in this new action given by the statute, the plaintiff cannot recover for the physical pain and mental anguish of the decedent. Prof. Graves, one of the most accurate of our law writers, in commenting upon the two cases last above mentioned, says: "In *Ches. & O. Ry. Co.* v. *Rogers*, 100 Va. 324, 41 S. E. 732, the instruction as to damages was in the usual form except that the jury were told that they could add damages for 'mental and physical anguish of the deceased,' and this instruction was approved by the Court of Appeals. The judgment for the plaintiff was reversed on other grounds and this part of the instruction may not have received deliberate attention. According to the reasoning in *Anderson* v. *Hygeia Hotel Co., ante,* the mental and physical anguish of the deceased would seem to be irrelevant as an element in the measure of damages of the beneficiaries, unless as evidence to enable the jury to estimate the mental anguish of the beneficiaries, where the death of the husband, or father, for example, occurs, not instantaneously, but after an interval of suffering and under harrowing circumstances." Graves' Notes on Torts, p. 25.

The mental anguish of the beneficiaries may have been increased by the neglect of the doctor, and the plaintiff had

the right to show this fact and to recover damages therefor, but it is still their mental anguish and not the physical pain and mental anguish of the decedent for which recovery is allowed, and it was error to instruct the jury that they "should add thereto such further sum as they shall deem reasonable and just compensation for physical pain and mental anguish suffered by decedent by reason of the neglect of the defendants during his last illness."

We have not considered the many assignments of error in the order in which they are made, and many of them we have not discussed at all, but enough has been said to show the views of the court on the vital issues involved. We have dealt with the instructions only so far as appears to be necessary for the future guidance of the trial court.

[21] It remains to be determined what disposition shall be made of the case. As to the plaintiff in error, Dunkley, it is quite plain that a new trial is necessary, both on the question of his liability and the amount of damages awarded. As to him, the verdict of the jury and the judgment of the trial court entered thereon, will be set aside and annulled, and the case remanded for a new trial to be had not in conflict with the foregoing opinion, and he will be awarded his costs in the trial court and in this court. As to the Virginia Iron, Coal and Coke Company, plaintiff in error, the verdict of the jury and the judgment of the trial court thereon will be set aside and annulled, and the case will be dismissed at the costs of the defendant in error. Section 6365 of the Code provides that this court "shall render final judgment upon the merits whenever, in the opinion of the court, the facts before it are such as to enable the court to attain the ends of justice." In the opinion of the court, the facts proved do not establish any liability upon the coal company. The evidence to establish the terms of the implied contract between the coal company and its employees is as full as the circumstances of the case

admit of, and as could be reasonably expected on another trial, and full opportunity was afforded the plaintiff below to introduce any evidence he had on the subject of "profits" made by the coal company. We have before us all the evidence that was presented in the trial court, and, "in the opinion of the court, the facts before it are such as to enable the court to attain the ends of justice," in so far as it affects the liability of the Virginia Iron, Coal and Coke Company, plaintiff in error.

*Reversed.*