TEXAS AND PACIFIC COAL COMPANY v. J. W. CONNAUGHTEN.

Decided March 25, 1899.

**Master and Servant—Medical Treatment for Servant.**

A master making a compulsory reduction from the wages of his employes to provide a fund for medical attention and surgical treatment, no rebate being allowed to the employes in case the entire fund is not required, is liable to an employe for unskillfulness or negligence of the physician employed by him to attend the employe.

APPEAL from Tarrant. Tried below before Hon. IRBY DUNKLIN.

*John W. Wray,* for appellant.

*Q. T. Moreland* and *Capps & Canty,* for appellee.

STEPHENS, Associate Justice.—Appellee was injured while mining coal for appellant in one of its mines at Thurber, Texas, in the year 1896, and was consequently treated at the instance of appellant by one of its physicians, Dr. Benney, though in an unskillful or negligent manner. This suit was brought to recover the damages caused by such improper treatment, and issued in a verdict and judgment for $1500.

Appellant concedes that the verdict is conclusive against it upon the fact of unskillful or negligent treatment, and no complaint is made of the amount of damages allowed. The main contention, in different forms urged, seems to be that appellant was not liable for the unskillfulness or negligence of the doctor, since, as was alleged in its answer, due care had been used by it in selecting him, and his services had been furnished as a charity and not for profit.

On the other hand, appellee sought, and here maintains his right, to recover upon the ground that as a part of his contract of employment, appellant agreed and undertook, in consideration of 50 cents per month deducted from his wages, to furnish him competent medical and surgical treatment, and that appellant made a like deduction from the wages of all the rest of its employes, and in consideration thereof voluntarily assumed and undertook "to treat and care for properly and in a skillful manner" said employes in case of sickness or injury, and so undertook to treat appellee. Since the verdict sustains his contention, we quote with approval from his brief the following statement of the material facts and evidence, in support thereof:

"J. W. Connaughten testified: I went to Mr. Gordon, superintendent of the company, to get employment; asked him for work, and he gave me work and directed me to go to the mine boss and he would put me to work. I was to be paid $1 a ton for coal. I went to the mine boss then and got work. They kept out of my pay for hospital fee and blacksmith fee. They kept out other incidental expenses for powder and checks. When a miner was hurt he was to get medical and surgical attention and hospital conveniences, for which he was to pay 50 cents per month, and that amount was kept out of my pay while I worked there. I did not send for the doctor; I believe the mine boss did.

"R. H. Ward, assistant general manager of the Texas & Pacific Coal Co., testified: We collect or deduct from the wages of all of our employes 50 cents per month, which goes to the hospital fund. We charge 50 cents a month for hospital funds. For that 50 cents per month we give the miner his medical attendants, hospital service, and everything the officers think proper in connection with the health and efficiency and maintaining of the people there. Every man is supposed to agree to the 50 cents deduction when we hire him. Most who come there understand it. It might have to be explained to him. We would explain it to him,

of course; tell him we would keep that for the purpose of employing a physician to attend him when sick or hurt. We never make any exception in the management of the mines on account of one man. If he objects to the deduction we would still retain the 50 cents. If he objects to the management of the place, he don't have to stay, and he could leave; but we would hold the 50 cents, because we have undertaken to treat him when he is sick, or to pay for his treatment by any physician we have. The company makes contract with all the physicians, and the miners have nothing to do with employing the physicians, nor with the dispensation of this fund. A miner going out and calling any physician other than Dr. Binney would have to pay that physician himself. There are no physicians living there (in Thurber) except the two employed by the company. There were from 2500 to 3000 inhabitants in Thurber in 1896, and about 1000 employes.

"On the question of investigation Mr. Ward testified: My recollection is that I wrote a letter for Colonel Hunter to a brother of Dr. Binney, who is also a doctor, and he lived in Missouri or Illinois. That letter is the only investigation I know of. Dr. Binney, I think, is a nephew of Colonel Hunter. There is no particular rule for the distribution of this fund. The miners have nothing to do with the dispensation of this fund. It is dispensed by the officers of the company and under their discretion.

"G. B. Paxton testified: Upon hospital account for 1894 there was a credit of $7080.98, and a debit of $3773.48, which left a balance of $3307.50. That balance represents the amount collected from the miners above the amount expended for 1894. During 1895 there was $6558.83 collected and $6431.83 expended. The balance to the credit of hospital fund January 1, 1896, was $3434.50, and January 1, 1897, it was $3160.89. The fund had on hand January 1, 1898, $4167.10. That balance is in the hands of the Texas & Pacific Coal Company. It is in some of their banks. They have a bank account, and of course keep their money in the bank. They do not keep any separate hospital account. They keep the hospital account separate in their business on the books, but don't keep their money separate. They keep all their accounts separate on their books the same way. There are a great many accounts, all kept separate on the books, but not kept separate in the bank, and the hospital account is kept in the same books with the other accounts of the coal company The money (hospital account) is put in bank to the credit of Texas and Pacific Coal Company, together with the other Texas and Pacific Coal Company's moneys. I made out an annual statement in January, 1897. In that statement all the money the defendant had in the bank was put down as an asset, and the hospital account was included in the statement as well as any other account. This charge for doctors' horses is for their board at the livery stable, and that is charged to the hospital fund as a part of its expenses.

"Ed S. Britton testified: For the past three years I have been manager of the mercantile department of the Texas and Pacific Coal Com-

pany. As to the journal voucher for $100.25, it is for persons who were sick or injured in the mines and checks had been furnished them—merchandise coupons—and they were good in the company's store there for supplies and charged to this (hospital) account. The merchandise check is a coupon which is issued on a man's wages, and it passes current for supplies in the store. In this case the checks were for any supplies the parties might need, and were charged to hospital account, because the parties were not able to work and the company furnished them with checks for supplies, and the checks were charged to the hospital account. Drugs, coffins, etc., are bought from the company's store, if the company has what they want. If not, it is ordered for them by the company. As to the Texas and Pacific Coal Company's contributing to the hospital fund, I only know this much, that anything contributed there is charged to that account, whether there is anything to the credit of that account or not. If a miner quits work there, he don't get anything. After he leaves the employ of the company he is not entitled to benefits under that contract."

Without adverting to features of the evidence that may be susceptible of a contrary interpretation. we conclude from the entire record: First, that appellant undertook for hire and profit, and through a physician of its own selection, to treat appellee when he was injured in the mine, and not merely to furnish him a physician as a charity; second, that such was the nature of the contract of employment, though not discussed at the time it was entered into. We need not, therefore, determine whether due care had been used by appellant in the selection of the physician.

*Conclusions of Law.*—To sustain the contention that in employing physicians and surgeons to treat the sick and wounded employes at the Thurber mines appellant was only dispensing a charity, and hence not liable for the negligence of the physicians and surgeons so furnished, due care having been used in selecting them, the following cases are cited: Railway v. Artest, 60 Fed. Rep., 367; Railway v. Mauldin, 19 Texas Civ. App., 166; Railway v. Scott, 18 Texas Civ. App., 321; Railway v. Sullivan, 40 N. E. Rep., 139; Railway v. Ziller, 38 Pac. Rep., 283.

On the other hand, the appellee cites as opposed thereto the case of Clavin v. Rhode Island Hospital (Rhode Island), 34 American Reporter, 675, which undertakes to show that this line of American cases, beginning with McDonald v. Hospital, 120 Massachusetts, 432, rests upon the authority of an old English case since overruled in England. However, in an exhaustive note to a Kentucky case reported in 23 Lawyers' Reports Annotated, 200, the editor comes to the conclusion—the Rhode Island case being among the many reviewed—that the "clear weight of authority is in favor of the doctrine   *   *   *   which exempts a charitable institution from liability for negligence of officers or agents." See, also, 3 Elliott on Railroads, secs. 1379, 1388, 1389, and cases cited in footnotes.

But the view we take of the case at bar, as indicated in our conclusions of fact, enables us to steer clear of this controversy. Ward, the assist-

ant general manager, admitted in his testimony that the company, besides employing and paying the physicians and exacting deductions from the wages of all the employes alike, *undertook to treat them when they were sick*. The money so paid by the employes or reserved by the company yielded the company a a profit above all expense of several thousand dollars, which went to its credit in the bank together with the other moneys of the company. This was not a trust fund in which the employes had any permanent or substantial interest. All the company had to do to rid itself of any such claim was to rid itself of the employe. "After he leaves the employ of the company," says Britton, "he is not entitled to benefit under that contract."

The true relation between the company and its employes, as we understand it, was this: In consideration of a reduction of the wages of all the men employed and the profit to be made by the company, it bound itself to furnish medical treatment to such of them as should get hurt or become sick while working for the company. It should therefore bear the loss of improper treatment, since the law implies in such cases an undertaking to give proper treatment. So far from showing the creation of a trust fund for charitable purposes, the record suggests a monopoly, with accrued profits, in taking care of the sick. At all events, we think it will bear the construction which we understand the jury to have, given it.

The charge of the court is complained of, but as applied to the facts of this case we approve it as being substantially correct. That is, it contains nothing to appellant's injury. The first paragraph made appellee's right to recover depend upon a contract on the part of appellant, for a valuable consideration, to furnish him with skillful surgical treatment in the event of his being hurt while working in the mines; but the court in that connection further instructed the jury that if the deductions from wages of 50 cents per month were not designed by appellant for the purpose of profit, and that appellant administered the fund so arising as a charity, etc., appellee would not be entitled to recover under that paragraph. The second paragraph required the jury to find negligence on the part of the company in the selection of the physician before it could be held liable on the phase of case submitted in that paragraph.

The requested charges were all properly refused, and so was the motion for new trial. The judgment is therefore affirmed.

*Affirmed.*