## THOMAS et ux. v. POSTAL TELEGRAPH-CABLE CO. et al.

### No. 12636.

Court of Civil Appeals of Texas. Fort Worth. Feb. 20, 1932.

Rehearing Denied March 19, 1932.

E. W. Napier, of Wichita Falls, for plaintiffs in error.

Bullington, Humphrey & King, of Wichita Falls, for defendants in error.

CONNER, C. J.

This is an appeal from a directed verdict and judgment in favor of the Postal Telegraph-Cable Company and the Wichita Falls & Southern Railroad Company in a suit instituted by J. C. Thomas and wife to recover damages suffered by them as the result of negligence on the part of the appellee railroad company which caused the death of their minor son, Elmer Thomas.

In so far as necessary to state, the plaintiffs alleged that their son, about 16 years of age, was an employee of the companies named, working under an agreement that in the event of sickness from any cause the com-panies would furnish all necessary and proper medical and hospital services; that while so employed Elmer Thomas became infected with tonsilitis, which in the beginning incapacitated him from working only temporarily, whereupon, in accord with said agreement, due application was made to Dr. R. C. Smith, the companies' chief surgeon in charge of the medical staff maintained for the services stated, for treatment and proper hospital services. According to further allegations of the petition, Dr. Smith treated the boy during a continued progression of his disease from about the 11th day of December, 1928, until the 8th day of March, 1929, when he stated that he was unable to do anything further for him and that the boy would die.

It was further alleged that Dr. Smith was guilty of negligence in failing to remove the affected tonsils and in failing to furnish hospital facilities and in other particulars not necessary to mention, as a result of which the boy died on July 17, 1929, notwithstanding the plaintiffs' further efforts to save him.

The defendants denied the acts of negligence charged and alleged that as a mere charity they had provided sick and hospital funds for the benefit of their employees by assessing each one a percentage of his monthly wage or salary, and hence were not liable in damages for the negligence of Dr. Smith, if any, in his treatment or want of proper treatment of Elmer Thomas.

It is vigorously contended in behalf of appellants that the court erred in taking the case away from the jury and rendering judgment against them. The undisputed evidence, relevant to the vital question presented for determination, is briefly but substantially as follows: In the city of Wichita Falls the appellee companies jointly occupied the same office, the operative business of both being conducted by the railroad company. As arranged between themselves, the companies provided what is termed a "sick benefit fund" by assessing and collecting from each of the employees of both companies a percentage of his monthly salary or wage. The percentage so assessed and collected from Elmer Thomas was 50 cents per month. This fund is used to pay doctor and hospital fees of the employees who get sick or are injured in the service.

Mr. Bassett, vice president and general manager of the Wichita Falls & Southern Railroad Company, called as a witness by the plaintiffs, testified, among other things, that:

"There is not a separate association, covering the hospital association, financed by the railroad company, and any shortage is made up by the railroad, there is not any separate hospital association, just handle that ourselves. * * *

"The company never pays any doctor other than the ones on the staff, they are the only

ones that the railroad company pays. * * * As to how we pay Dr. Smith, he sends in the bill each month showing the calls that he made, and the employees that he has seen, and we voucher the bill and send him a voucher. * * * The collection of the hospital fee was in effect when I came to the property on January 1, 1924. This money is paid in just like any other money in to the treasurer of the company, the treasurer of the Wichita Falls Southern Railroad Company. An auditor keeps the book, we don't have any money at present belonging to that fund, I knew that because we make up the deficit every month. I can not say how much was paid in last year to that fund. * * * The fund is used for paying bills, medical attention and drug bills. What I mean by medical attention, if a person is sick and needs a doctor, they wait on him and at the end of the month they send us a bill. * * * We have Dr. Smith as head of the medical staff here, but don't have any hospital here, and the only reason, or arrangement that we had with Dr. Smith is that he was appointed head of the medical staff, we don't have a contract with him. The oral understanding between us and Dr. Smith is that he takes care of all the employees, as his good judgment might dictate, whatever he does about it is all right with the company. If a man is sick and he thinks that he should go to the hospital, then we do not question him about it, he selects the other doctors himself, the railroad company pays the other doctor which he selects on the same basis they do Dr. Smith. We pay them direct through vouchers. The only service we receive from Dr. Smith is the treatment of our employees. It is an advantage for the employees to have a doctor to take care of them when they get sick or injured. It is not an advantage to the company, it is just for the benefit of the employees. The company is interested in the efficiency of the man. As to whether it is an advantage for the company or for the men to have a doctor available for him so that he may receive proper medical treatment, so that he will give better service to the company, it is true, so far as health is concerned. I don't know that it is an advantage for a railroad company to give the men proper medical attention, we pay our men good wages, there is no reason why they should not be able to take care of their own medical requirements. I know that it costs us money each month. We never made an accounting to the men in regards to this fund, we have never done it in the history of the railroad company so far as I know, no employee knows anything as to the condition of the fund that we are talking about, if there was a surplus there, we would apply it to the deficit. We would not pay any of it to Mr. and Mrs. Thomas, they would not be entitled to any of it. As to whether we would if there was an over surplus, over and above the deficit, that is too far fetched, because there is no surplus, if there were, we would not distribute it among the deceased employees' beneficiaries. * * * The reputation of Dr. Smith I think is very good, practically all of our employees who have Dr. Smith wait on them also have him as their family doctor. I know that Dr. Smith uses Dr. Beckman, Dr. Little and Dr. Graham, and I believe that he has others that he calls on when he can not get any of these that I have mentioned. * * * I have never had any complaint from any of the employees or anybody else concerning the inability or lack of qualifications of any of those gentlemen. No one has ever complained to me about them not being properly equipped."

Mr. O. B. Wamack, the auditor of the railroad company, called as a witness at the instance of the plaintiffs, after testifying as to the method of collecting the fund, etc., said: "I deposit this fund, this hospital fund, just like I deposit all other receipts of the company. I handle the funds, I make no distinction between that fund and the receipt for passenger fares or freight, so far as the cash is concerned. I keep the fund separate on the book. I have a book that shows the status of the fund all of the time. * * * I told you on a former trial that there was never a deficiency fund until recently and that I think is correct. * * * I have known Dr. Smith for some fifteen or twenty years, maybe longer. I could not say for sure. * * * I do not think Dr. Smith holds himself out as a specialist of any kind, I think a general practitioner is what you would call him, just general practice. I know Dr. Little and I know Dr. Beckman (two of the medical staff). So far as I know neither of the three are throat specialists. * * * This fund (hospital fund) was used only for the purpose of taking care of sick employees, or employees that were injured not in line of duty, for which the railroad company could not be held responsible. That was the idea of the fund to take care of employees who were hurt or sick and for which the railroad company was not responsible. * * * As to the fees we pay Dr. Smith, we pay him the regular price of a visit less 50%, and operations are paid for on the same basis. * * * I have known Dr. Smith fifteen or twenty years, and as to the reputation that he has borne in Wichita Falls, and that he did bear at the time he was selected, as to being a competent physician, I think it was good. Yes, I know his reputation was good."

■ There was other testimony of like import with that above indicated. There is also testimony by the plaintiffs and others sufficient, we think, to take the case to the jury on the issue of the alleged negligence of Dr. Smith in failing to properly treat, to furnish hospital facilities, and to operate, which by progressive stages resulted in the boy's death. But we need not present nor discuss this testimony for the want of sufficient testimony of any neg-

ligence on the part of either of the appellee companies in the selection, appointment, or supervision of Dr. Smith as chief of the medical staff which served in cases for which the fund collected was intended. Indeed, there was no request in behalf of appellants for the submission of this issue, and we therefore conclude, as will hereinafter more fully appear, that neither appellees can be charged with liability for the negligence, if any, of Dr. Smith, or of those composing the staff under his supervision.

While the authorities are not entirely harmonious, those by which we must be controlled treat a fund accumulated and distributed for the purposes and under the circumstances shown in this case as a trust fund or charity. In Black's Law Dictionary a "charity" is defined in part as follows: "Acts of benevolence; relief, assistance or service accorded to the needy without return. Also gifts for the promotion of philanthropic and humanitarian purposes."

In 5 R. C. L. § 117, p. 373, it is said: "A railroad hospital maintained by contributions for sick and injured employees, and not run for a profit, has been considered to be a charitable institution, and the same has been held true although the hospital is entirely maintained by the railroad company, but without profit. But such an institution is not a charity, if the benefits it extends to employees are on condition of relieving the employer from liability for negligence causing an injury."

In a note to 2 L. R. A. (N. S.) 557, it is said: "So, a hospital maintained by a railroad company for the free treatment of railroad employees, and supported partly by contributions, which the company deducts monthly from the wages of its employees, the balance being paid by the company itself, is a charitable institution, and the company is not liable for the malpractice of a physician, or the carelessness of the attendants. Union P. R. Co. v. Artist, 60 F. 365, 23 L. R. A. 581, 9 C. C. A. 14."

In Williams' Adm'x v. Church Home for Females and Infirmary for Sick, 223 Ky. 355, 3 S.W.(2d) 753, the Kentucky Court of Appeals declared that: "Under the law prevailing in this state, a charitable institution not conducted for profit, but organized solely for the purpose of the treatment and care of the poor and the sick, and whose income, whether derived from donations or from pay patients, is devoted exclusively to the maintenance of the institution, is exempt from liability for the torts of its agents or employees," citing cases.

The Kentucky case is also reported in 62 A. L. R. 721, with an annotation of numerous authorities which illustrate various applications of the doctrine. In the note we find this: "Ordinarily, an incorporated hospital, primarily maintained as a charitable insti-tution, is not liable for the negligence of its officers and employees, unless it fails to exercise ordinary care in the selection of competent officers and employees," citing cases from Georgia, Washington, and North Carolina.

The first of our own cases to which our attention has been called, or that we have found, is that of T. &. P. Coal Co. v. Connaughten, 20 Tex. Civ. App. 642, 50 S. W. 173, 174, by this court, writ of error denied. In that case a sick benefit fund was accumulated by the company, as here, by deducting from the wages of the employees 50 cents per month. It was held that Connaughten was entitled to recover in the suit brought by him for the damages caused by improper treatment by one of its physicians. This is the only case relied upon in behalf of appellants. By examination of the case, however, it will be found that for the deductions made from the laborers' wages the company issued a check or coupon, chargeable to the benefit fund, which passed current for supplies in the company's stores. It appeared that all stores operated at the place in question were operated and controlled by the company, which constituted, in effect, a monopoly. The stores were presumably conducted for a profit to the company. In that case it also appears that Connaughten was injured while mining coal for the company, and not, as in this case, where the laborer's sickness was not the result of an injury for which the companies were liable. The court, in the opinion which was written by Mr. Justice Stephens, expressly concluded from the entire record that: "Appellant [the coal company] undertook for hire and profit, through a physician of his own selection, to treat appellee when he was injured in the mine, and not merely to furnish him a physician as a charity."

The next case relating to the subject appearing in this court was that of Zumwalt v. Texas Central Ry. Co., 56 Tex. Civ. App. 567, 121 S. W. 1133, 132 S. W. 112. The facts in that case relating to the formation and application of the sick benefit fund are very similar to the facts in the case now before us, and there, as here, the trial court gave a peremptory instruction to find for the railroad company. In an opinion by the writer of the present opinion, this court held, in substance, that the issue of whether the fund had been established and administered for the benefit and profit of the company should have been left to the jury, weight being given to the facts, as here, that the injured laborer had no interest in the fund raised, nor in its distribution, and that the hospital conducted was established and operated as a distinct part of the business for which it had been chartered, taking occasion to also say that: "The fact that it does not appear, as in the Connaughten Case, that there is under

the contract with Dr. Webb a distinct pecuniary profit, in the conduct of the hospital department, should not, it seems to us, be conclusive. As an incident to its main business it may be deemed to be otherwise beneficial and profitable. We would feel a hesitancy in saying that as so incidental to its business as a railway carrier it is outside of the scope of its corporate powers to maintain a hospital department. Aside from charitable purposes, for which railway companies are not organized, it may be said to be in the pecuniary interest of such a company to maintain a state of health and capability among its employees as instrumentalities of its business. Why should it be said that this is in no sense of profit to appellee? True, perhaps, no direct pecuniary benefit is received, but the same may be said to be the case in the conduct of its machine shops and other departments, where its insensate physical properties are repaired when injured. At least it seems to us that it was for the jury and not the court to say from all the circumstances."

The views so presented in the Zumwalt Case, however, were not approved by the Supreme Court upon a writ of error granted by that court on the ground that we were in conflict with the case of G. H. & S. A. Ry. Co. v. Hanway (Tex. Civ. App.) 57 S. W. 695, and it was held that the judgment of this court should be reversed and that of the trial court affirmed.

Appellants urge, among other things, in substance, that the fund under consideration cannot be said to be a pure charity, for the reason that the employee, however great the accumulation of the fund, is given no interest therein, and for the further reason, as suggested in the Zumwalt Case as written by this court, it is a benefit and profit to the company to maintain the health of its employees. We think, however, upon a consideration of the authorities already cited, it will be seen that these contentions are distinctly without legal force.

On the whole, we conclude that the judgment of the trial court must be affirmed.

Judgment affirmed.

### On Motion for Rehearing.

While it is true, as appellants insist, that in addition to what has been quoted in our original opinion, Mr. Bassett testified that: "I would say that is the understanding, that for the money collected, deducted from the wages, the company will provide a physician and provide such hospitalization as the men might need. I think that the company has done that," it is insisted that this at least tends to show that there was a contract on the part of the appellee company to furnish its injured employees with proper medical and hospital services; but in the opinion of the majority when this statement of the general manager is construed with all of the same witness' other testimony, some of which is copied in our original opinion, and also considered in connection with the testimony of other witnesses, the quoted testimony relied upon fails to establish a contractual liability on the part of appellee as distinguished from a mere obligation to administer the fund collected from appellees' employees as a charity. In addition to what appears in the opinion already written, there was other testimony tending to show that the appellee company and the railway company with which it is associated merely continued the practice or method of collecting and using the fund in question as had been adopted by a former railroad company. And there is no testimony which shows the terms of a contract as distinguished from a charity founded by the former railroad company to supply its employees with medical and hospital services. Hence, while we deeply sympathize with the parents of the deceased boy, the majority can but think upon a consideration of the whole record that the conclusion announced in our original opinion should be adhered to.

The motion for rehearing is accordingly overruled.

BUCK, J. (dissenting).

It will be remembered in this case that the trial court instructed a verdict for the defendants. Therefore, if there is any evidence tending to show that either of the defendants was obligated to furnish doctor's services and hospital service, then the trial court erred in instructing a verdict for the defendants. While L. N. Bassett, vice president and general manager of the Wichita Falls & Southern Railway Company, was on the stand, he testified:

"As to the arrangement between the Southern and its employees with regard to medical treatment and hospital care, we have a fund that is secured by deducting from the salary and wages of employees on the basis of 50¢ for a monthly salary up to $100, and $1.00 from the salary or wages of employees who earn more than $100 or more. This fund is used to pay doctor and hospital fees of employees that get sick or injured, in the service.

"As to hospital care, the hospital is paid by the Wichita Falls & Southern Railway Company where employees are injured in the service, and they are paid by the railroad company when the employee is sick, he is instructed to go to the hospital, by the doctor in charge of the railroad.

"There was a letter put out by me some three or four years ago just outlining briefly the policy of the railroad company in paying the expenses of the employees who was sick or injured in the service. It was sent to the heads of the various departments.

"I will get you a copy of it if I can locate it, we have not been able yet to get a copy. We keep those things in the files, but occasionally they get misplaced. I put it out some three or four years ago.

"There is not a separate association covering the hospital association, financed by the railroad company, and any shortage is made up by the railroad, there is not any separate hospital association, just handle that ourself."

It would appear from this testimony that the railroad company collected this fund from the employees, and that it was under obligation by virtue of such fact to furnish medical and hospital care. It is immaterial whether or not other testimony contradicted the testimony of Mr. Bassett, because, unless the testimony shows that the furnishing of the medical treatment and hospital care was a mere charity and not a part of the duty of the employer, the court could not instruct a verdict for the defendants.

It is the judgment of the writer that the motion for new trial should be granted and the cause remanded to the trial court for new trial. The writer is inclined to believe that this case comes more nearly in point to the case of Texas & Pacific Coal Co. v. Connaughten, 20 Tex. Civ. App. 642, 50 S. W. 173, writ of error refused.